Reginald N. SANDERS, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Oct. 12, 1988.
Resubmitted After Supplemental
Briefing: April 19, 1990.
Decided: Dec. 28, 1990.

M. Jane Brady (argued), Deputy Atty. Gen., Dept. of Justice, Georgetown, and Timothy J. Donovan, Jr. and Thomas H. Ellis, Deputy Attys. Gen., Dept. of Justice, Wilmington, for appellee.

Theopalis K. Gregory (argued), Gregory and Gregory, and Selma Hayman, Berg, Bifferato, Tighe & Cottrell, P.A., and Patricia C. Hannigan, Cooperating Attys. for American Civil Liberties Union, Delaware Affiliate, Wilmington, amicus curiae, for appellant.

Before CHRISTIE, C.J., HORSEY, MOORE, WALSH and HOLLAND, JJ., constituting the Court *en banc.*

WALSH, Justice:

In this appeal, the Court confronts an important question of first impression: May a defendant who is found to be "guilty but mentally ill" under 11 *Del.C.* § 401(b) be sentenced to death? The appellant, Reginald N. Sanders ("Sanders"), was convicted of Murder in the First Degree, Robbery in the First Degree, and Possession of a Deadly Weapon During the Commission of a Felony. Because the jury found that Sanders suffered from a psychiatric disorder but was not insane at the time of the offenses, it rendered verdicts of "guilty but mentally ill" on all three charges. The same jury then recommended that Sanders be sentenced to death. On appeal, Sanders and the American Civil Liberties Union (the "ACLU"), which served as *amicus curiae* on his behalf, urge several grounds for the reversal of his conviction and his sentence. We find no merit in the challenges raised by Sanders to his conviction. We conclude, however, that, on the uncontroverted evidence in this case, the jury's verdict of "guilty but mentally ill" established a mitigating factor as a matter of law and the failure of the trial court to instruct the jury to that effect was plain error. Accordingly, we affirm Sanders' conviction but vacate his sentence, remanding the case for a new penalty hearing.

I

The circumstances underlying the murder and robbery were not seriously contested at trial. In the early morning hours of August 3, 1985, June Butler returned to her residence in Dover, Delaware after paying a visit to a relative. She found her husband, John Butler, lying on the living room floor. Thinking that Mr. Butler, who suffered from diabetes, was in a diabetic coma, Mrs. Butler called for an ambulance. When the ambulance attendants arrived, they discovered that Mr. Butler was dead, having been stabbed twice in the heart and struck several times on the head with a blunt instrument.

When the police arrived on the scene, they found that Mr. Butler's wallet was missing and that his car keys had been taken from his pocket and placed in the ignition of his car, which was still in the garage. A video cassette recorder had been removed from the den and was also found in the car. The automatic garage door had become jammed, apparently as the result of an attempt to open it manually, and a tag that had been attached to the garage door mechanism was missing. There was no sign of forced entry or struggle.

In response to police questioning, a neighbor reported that she had seen Sanders approaching the Butler residence late in the afternoon of August 2. She recognized Sanders, a young man of nineteen, because he did yard work for the Butlers and others in the neighborhood. Another neighbor reported that he had seen a man fitting Sanders' description in the driveway of the Butler house later in the evening. Most important, several clear fingerprints were found on the trunk of Mr. Butler's car, and the prints were later identified as belonging to Sanders.

Pursuant to a warrant, the police searched Sanders' residence on August 3; Sanders was not present at the time. They found a shirt with blood stains that were determined to be consistent with Mr. Butler's blood type and inconsistent with Sanders'. They also found Mr. Butler's wallet and the tag that had been removed from the garage door mechanism. When Sanders returned home, he was placed under arrest.

Sanders was indicted on charges of Robbery in the First Degree, Burglary in the First Degree, Possession of a Deadly Weapon during the Commission of a Felony, and three counts of Murder in the First Degree. One murder count alleged an intentional killing, one count a reckless killing during a robbery, and a third count a reckless killing during a burglary. Because Sanders had a history of mental instability, several mental health profession-

als examined Sanders to determine his competency to stand trial. Dr. Irwin G. Weintraub, a clinical psychologist, concluded that Sanders suffered from schizophrenia of the paranoid variety, and that although Sanders had a general understanding of the charges against him, his ability to assist counsel would be handicapped by unpredictable thinking, feeling and behavior. Dr. Kutas T. Dogan, a psychiatrist at the Delaware State Hospital who examined Sanders at the State's request, found that although Sanders suffered from adolescent onset schizophrenia, the condition had been stabilized through medication. Dr. S.M. Iqbal, a clinical psychologist at the State Hospital, concurred in Dr. Dogan's findings. On August 14, 1986, the Superior Court ruled that Sanders was competent to stand trial.

At trial, Sanders sought to prove that he was "not guilty by reason of insanity," within the meaning of 11 *Del.C.* § 401(a). Thus, a considerable body of evidence concerning Sanders' mental condition was presented at trial. Sanders' mother described her son's childhood experiences and the changes that occurred in his personality in the years preceding Mr. Butler's murder. Although Sanders had some difficulty in learning, his development was relatively normal until 1983, his senior year in high school. At that time, he became increasingly rebellious and prone to temper tantrums. He failed several classes and did not graduate, although he obtained an equivalency certificate the following year. In the fall of 1984, he enrolled at Shaw University in North Carolina but left after a month. He then entered the Marine Corps but was discharged after nine days because of a marked failure to adapt to the requirements of military life. From the beginning of 1985 onward, he lived with his mother and worked at odd jobs in the Dover area. He became acquainted with the Butlers because he occasionally did yard work for them.

Sanders' mother described numerous occasions when her son's behavior manifested his growing psychological difficulties. He became easily angered and would destroy his mother's property if he became upset. He began compulsively to take several showers during the course of a morning or afternoon, explaining to his mother that he felt dirty. On one occasion in early 1985, he began to spit on the kitchen floor and then earnestly denied that he had done so when questioned by his mother. On another occasion, he scooped dust balls and dirt off the floor and ate them.

On a third occasion, Sanders became convinced that his girlfriend had been unfaithful to him and he began shouting at his mother as if she were his girlfriend. Finally, in the spring of 1985, he battered down the door of his mother's bedroom with a five-pound dumbbell and held it menacingly before dropping the weight and silently leaving the room. At this point, Sander's mother called the police, and Sanders was eventually admitted to the Delaware State Hospital.

Although Sanders was initially diagnosed as suffering from a schizophreniform disorder, the diagnosis was changed to adjustment disorder, possibly aggravated by abuse of marijuana.[1] The hospital prescribed a tranquilizer and allowed Sanders to go home. Upon returning from the hospital in late May, 1985, Sanders reported to his mother that "I don't hear voices anymore like I used to." However, he later told her that he was a king, that one of his friends was the devil, that a boy in the neighborhood was an eagle, and that the family dog could talk. In mid-July, when Sanders learned that his mother might need gall bladder surgery, he attempted to commit suicide by strangling himself with a garden hose.

Sanders did not testify at trial, but his understanding of the events of August 2 and 3 was revealed through the testimony

---

1. Sanders admitted using marijuana, and a small quantity was found in his car at the time of his arrest. However, the experts who examined Sanders after his arrest all agreed that substance abuse played no part in the psychosis that he suffered from at the time of the killing. Thus, the initial report of the Delaware Hospital was the only evidence that Sanders' behavior was affected by marijuana use.

of the doctors who examined him. Although Drs. Iqbal and Dogan had examined Sanders at the request of the State to determine his competency to be tried, they testified as defense witnesses at trial because they concurred in Dr. Weintraub's conclusion that Sanders suffered from schizophrenia at the time of the killing and that his illness had played a major role in his actions.[2] The expert testimony explicitly refuted the State's suggestion that Sanders' actions may have been the result of a toxic psychosis caused by drug use.

As related to the examining experts, Sanders became obsessed with the belief that Mr. Butler's diabetic condition caused him a great deal of pain. In fact, Mr. Butler had had his leg amputated as the result of the disease. In Dr. Iqbal's evaluation of Sanders, Sanders spoke of Mr. Butler as "a very sick man [who] had to take a lot of pills" and who had a "twisted body." Sanders began to "hear voices" that commanded him to end Mr. Butler's perceived suffering by killing him.[3] Apparently, he resisted the "voices" for some time, because he genuinely liked Mr. Butler and felt that killing him would be wrong. Eventually, however, he surrendered to his compulsion. On the night of August 2, he went to the Butler house with a rubber mallet and knocked on the door. When Mr. Butler let Sanders in, Sanders began to beat him until he was unconscious. The "voices" then "ordered" Sanders to go to the kitchen, get a knife, and stab Mr. Butler. He argued with the "voices" for a time but eventually obeyed them. He took Mr. Butler's pulse to make sure that he was dead and then decided to take Mr. Butler's car and video cassette recorder, although he abandoned this plan when the garage door jammed. He took Mr. Butler's wallet instead, telling Dr. Iqbal that "I wanted to keep something to remember of him." He expressed shock and remorse in his discussion with Dr. Iqbal, stating "I didn't want to hurt that man and he was such a nice man I don't know why I did that to him."

Dr. Weintraub testified that Sanders lacked substantial capacity to appreciate the wrongfulness of his acts because Sanders believed that the killing was necessary to end Mr. Butler's perceived suffering. Drs. Dogan and Iqbal testified that Sanders' "arguments" with the "voices" he heard showed that he had some capacity to distinguish between right and wrong. However, all three experts agreed that Sanders' illness rendered him incapable of

2. Schizophrenia is an extremely serious psychosis that is characterized by grossly distorted perceptions of reality, a withdrawal from social interaction, and a fragmentation of perception, thought, and reality. J. Coleman, J. Butcher & R. Carson, *Abnormal Psychology and Modern Life* 395 (6th ed. 1980). Hallucinations, delusions, nonsensical speech, violent or self-destructive behavior, and a loss of motor control are all common symptoms. Day & Semrad, Schizophrenic Reactions, in *The Harvard Guide to Modern Psychiatry* 199, 210–13 (A. Nicholi ed. 1978). The condition is subject to remission and relapse, but without treatment, the victim may eventually lose all touch with reality and even suffer neurological damage. *Id.* at 211–12. Drug therapy has proven to be quite helpful in controlling schizophrenia, but does not yet offer the hope of complete cure. *Id.* at 212–13.

Although found competent to stand trial, Sanders continued to evince symptoms of schizophrenic behavior after his arrest. During an examination by Dr. Weintraub, Sanders lapsed into the sort of pattern of nonsequiturs that is common among schizophrenics:

I read out of the Bible that people made pig out of rat and dog. Man made animal. Not from God. Muslims don't eat pork because it hurts your body. You people ate it. Do you know if King Tut made the black man look like a god. Took all forms and shapes.... World is turning better for some people. I help people. Not all people are evil. Don't want to take the harsh road by yourself. Choose it yourself. Your actions put you on the road. Don't have a sandwich to take. Hell is inside your coffin and you can't move. Lay there a 1000 years.... I used to be in the Marines too.

After his conviction, Sanders reported to Dr. Iqbal that he was troubled by "voices" that told him he would go to Hell for killing Mr. Butler.

3. As Dr. Iqbal testified, such auditory "command hallucinations" are a common manifestation of schizophrenia. *See also* J. Coleman, J. Butcher & R. Carson, *supra*, at 407. Although it is difficult objectively to verify that an individual is suffering from such hallucinations, Sanders' statement to his mother—"I don't hear voices anymore like I used to"—indicates that he had experienced hallucinations prior to the crime.

resisting his urge to kill Mr. Butler. Thus, the evidence on this question was uncontroverted.

The trial judge instructed the jury that they could reach the following verdicts: "guilty;" "not guilty;" "not guilty by reason of insanity;" or "guilty but mentally ill." On September 18, 1986, the jury acquitted Sanders of two counts of felony murder and the burglary charge but returned verdicts of "guilty but mentally ill" on the charges of intentional killing, robbery, and possession of a deadly weapon.

On September 22, 1986, the trial judge, acting pursuant to 11 *Del.C.* § 4209(d), reconvened the jury for the purpose of determining a punishment. In its instructions following a brief evidentiary hearing, the Court instructed the jury *inter alia* regarding the statutory definition of aggravating and mitigating circumstances. The jury was further advised that, as the State contended, the age of the victim could be deemed an aggravating factor. The jury was not advised that the defendant's mental state could be considered a specific mitigating factor nor was the jury advised that its finding of "guilty but mentally ill" had any significance in its consideration of an appropriate penalty. The jury then unanimously found that the victim's age was an aggravating circumstance, that any mitigating circumstances were outweighed by the aggravating circumstance, and that a death sentence should be imposed.

The defendant filed a motion to be declared not competent to be sentenced pursuant to 11 *Del.C.* § 405. The Superior Court held an evidentiary hearing at which it received reports concerning the defendant's mental condition from the same experts who testified at trial. The results were mixed, with Drs. Dogan and Iqbal concluding that the defendant's schizophrenic condition was under control through psychotropic medication and that he would be able to understand the sentencing process. Dr. Weintraub opined that the defendant continued to suffer from "command hallucinations" and lacked capacity to comprehend the sentencing process. The Superior Court ruled that the defendant was legally competent to be sentenced. The Court also held that the jury's finding of "guilty but mentally ill" did not foreclose the imposition of capital punishment. The death sentence was thereupon imposed and this appeal, mandated by 11 *Del.C.* § 4209(g), followed.

## II

Sanders' appeal forces us to examine the troubling issues that arise when evidence of a defendant's mental illness is offered to limit his criminal responsibility. It is generally agreed that a defendant's mental condition may, under some circumstances, provide a defense to criminal charges, but the law's understanding of the insanity defense and its relation to various forms of mental illness has varied over time and from jurisdiction to jurisdiction. Accordingly, before addressing the specific questions raised by Sanders' appeal, we examine the concepts and terminology needed to discuss this complex and unsettled area of criminal law. In addition, we must construe the statutory framework under which Sanders was found "guilty but mentally ill."

Commentators have often noted the distinction between "insanity" and "mental illness." *See, e.g.,* L. Hand, Letter to University of Chicago Law Review, *reprinted in* 22 U.Chi.L.Rev. 319 (1955); C. Torcia, *Wharton's Criminal Law* § 99 (14th ed. 1979). Insanity is a legal concept that comprises a narrow class of symptoms; mental illness is a medical concept that embraces a wide range of diseases. Thus, while both mild neuroses and debilitating psychoses may be included under the heading of mental illness, legal insanity exists only if the defendant's illness undermines his culpability to such an extent that punishment becomes inappropriate. In a psychiatrist's eyes, a person may be ill in varying degrees, but in the law's eyes, he is either sane or insane, either blameworthy or not blameworthy. Moreover, there is no agreement as to when the line between sanity and insanity is crossed. At least three distinct definitions of insanity have been used by American jurisdictions at various

times. First, almost all jurisdictions define insanity as a mental illness that deprives the defendant of the ability to know that he is committing a wrongful act. This test of insanity, drawn from *M'Naghten's Case*, 8 Eng.Rep. 718 (H.L. 1843), has generally been called the "cognitive" or "right-wrong" test. Second, a significant number of States have supplemented this test by providing a defense to those who lacked the ability to conform their behavior to the requirements of the law. This definition has been called the "volitional" or "irresistible impulse" test. The Model Penal Code definition comprises both the cognitive and volitional tests.[4] Finally, a small number of jurisdictions have experimented with a broader definition of insanity, allowing a defense to a defendant who can show that his criminal acts were the product of mental illness. *See, e.g., Durham v. United States*, D.C.Cir., 214 F.2d 862 (1954), *overruled, United States v. Brawner*, D.C.Cir., 471 F.2d 969 (1972). The *"Durham"* rule has now been rejected by all American jurisdictions except New Hampshire. *See State v. Abbott*, 127 N.H. 444, 503 A.2d 791 (1985).

By the early 1980s, the Model Penal Code definition of insanity, which included the volitional test, had gained wide acceptance. However, when John Hinkley was acquitted in 1982 of the attempted murder of President Reagan, the public outcry led many States to restrict their definitions of insanity. Three States, Idaho, Montana, and Utah, purported to abolish the insanity defense altogether, although they still allow for acquittal if mental illness prevents a defendant from forming the required *mens rea.*[5] Many jurisdictions that had previously adopted the Model Penal Code definition returned to the unvarnished *M'Naghten* standard, eliminating the volitional test. Finally, twelve jurisdictions, including Delaware, established the plea and verdict of "guilty but mentally ill" to govern defendants who are not legally insane but who nevertheless suffer from mental illness.

The common law of Delaware long recognized both the cognitive and volitional tests of insanity. *See Daniels v. State*, Del. Supr., 538 A.2d 1104, 1106 (1988); *State v. Windsor*, Del.Oyer & Terminer, 5 Del. (5 Harr.) 512 (1851). In 1973 with the adoption of the new Criminal Code, the General Assembly enacted a modified version of the Model Penal Code test, which was seen as a codification of the common law. *Delaware Criminal Code with Commentary* § 401 commentary at 69 (1973). As we found in *Daniels*, however, the General Assembly's enactment of the current 11 *Del.C.* §§ 401 and 408 in 1982 was intended to effect a fundamental change in the law governing evidence of mental illness in criminal proceedings. First, the 1982 amendments eliminated the volitional test from the definition of insanity; under the new statutory scheme, only the cognitive test provides a complete defense. Second, the amendments established the plea and verdict of "guilty but mentally ill," which is to apply to any person who commits a wrongful act but who "suffered from a psychiatric disorder which substantially disturbed such person's thinking, feeling or behavior and/or ... left such person with insufficient willpower to choose whether he would do the act or refrain from doing it, although physically capable...." 11 *Del.C.* § 401(b). Thus, a defendant who meets the volitional test is to be found "guilty but mentally ill," rather than "not guilty by reason of insanity" as had historically been true.

Under 11 *Del.C.* § 408, the differences between a verdict or plea of "guilty" and one of "guilty but mentally ill" are limited. Before a "guilty but mentally ill" plea will be accepted, the trier of fact must conclude that "the defendant was in fact mentally ill at the time of the offense." 11 *Del.C.* § 408(a). Moreover, once such a plea has been accepted or such a verdict rendered,

---

4. The Model Penal Code expands upon the traditional formulation of these tests by providing a defense to defendants who lacked the *substantial* ability to appreciate wrongfulness or conform to the law's requirements. Thus, it does not require proof of an absolute impairment of cognitive or volitional capacity.

5. Idaho Code § 18–207; Mont. Code Ann. § 46–14–102; Utah Code Ann. § 76–2–305(1).

the defendant "may have any sentence imposed on him which may lawfully be imposed upon any defendant for the same offense." 11 *Del.C.* § 408(b). After conviction, however, the defendant is to be confined in the Delaware State Hospital rather than in a correctional facility, and he is to receive treatment for his condition. The Hospital may discharge the defendant when it finds that "discharge is in the best interests of the defendant." *Id.* At such time, the defendant must serve the remainder of his sentence in the custody of the Department of Correction, receiving credit for any time he has spent under treatment. 11 *Del.C.* § 408(c).

The amendments enacted by the General Assembly appear to reflect not only a generalized dissatisfaction with the insanity defense in the wake of the *Hinkley* verdict, but also specific criticisms that have been levelled at the volitional test by legal and medical commentators alike. *See* Criminal Justice Mental Health Standards, standard 7–6.1 commentary at 340–41 (1988). Although the logic of exculpating defendants who literally could not control their behavior seems sound, the task of identifying such defendants presents unique challenges to the trier of fact. As the American Bar Association explains:

> The inclusion in the [Model Penal Code] test of a volitional element reflected a wave of clinical optimism that scientific knowledge concerning psychopathology had progressed substantially enough to permit informed judgments about the causes of abnormal behavior. Unfortunately, subsequent experience has not borne out that optimism. Behavioral science has not yet yielded clinical tools to calibrate impairments of behavioral con-

trols. There is, in short, no objective basis to distinguish between offenders who were undeterrable and those who remained undeterred, impulses that were irresistible and those not resisted, between "substantial" impairments of capacity and some lesser impairment.

*Id.* A basic premise of our criminal law is that individuals possess free will and may be deterred from committing crimes by the threat of punishment. Without question, it would be fundamentally unfair to punish an individual whose behavior was fully or even substantially determined by mental illness and who had little or no power to resist an impulse to commit a crime. However, the General Assembly's decision to eliminate the volitional test as a defense appears to reflect a conclusion that the task of determining which defendants, if any, truly lacked the power to control their behavior is beyond the ability of our courts or of modern medical science. As the synopsis to the bill enacting the repeal of the volitional test noted, "[T]here is the growing conviction that of persons who were in fact mentally ill during the commission of the offense, such mental illness for many did not (or should not have) sufficiently affected such person's ability to obey the law." H.R. 567, 131st Del.Gen.Assembly, at 4 (Mar. 18, 1982). This is a conclusion in which many experts, both legal and medical, concur. Criminal Justice Mental Health Standards, standard 7–6.1 commentary at 340–41 (1988). American Psychiatric Ass'n; *Statement on the Insanity Defense* 12 (1982).[6]

Despite the erosion of the volitional defense, it is recognized that mental illness does affect the propensity of certain indi-

---

**6.** Section 401(b) speaks of a "person with insufficient willpower ... to refrain," a rather narrow formulation of the volitional test. Thus, it might be argued that section 401(b) does not reflect a conclusion that medical science cannot measure volitional impairments with precision, but rather a conclusion that persons affected by an absolute lack of willpower should nevertheless be punished for their misdeeds. However, since any significant impairment of volition due to mental illness would qualify as a "psychiatric disorder which substantially disturbed ... behavior," the language dealing with a defendant's

willpower is redundant. Because, however, that language is drawn from the former statutory definition of insanity, we believe that it was included in section 401(b) to make it clear that the volitional test had been eliminated as an absolute defense and that defendants who would have been acquitted under the prior statute must now be found "guilty but mentally ill." The fact that any significant volitional impairment is included within the scope of section 401(b) eliminates the need for expert witnesses to make implausible distinctions between an absolute and partial impairment.

viduals to commit unlawful acts. The hallucinations and delusions that are produced by diseases such as schizophrenia are well-established psychological phenomena, and their impact on the behavior of the affected individual is likely to be significant. *See, e.g.,* Day & Semrad, *supra,* at 210–15. Just as an alcoholic's ability to resist the urge to drink is severely weakened by his disease, so an individual who suffers from certain varieties of mental illness may find it quite difficult to resist urges to engage in antisocial behavior. The inability of law or medicine to establish when, if ever, an individual's behavior is *completely* controlled by mental illness does not preclude a determination that a given defendant's actions may have been strongly influenced by mental illness. A defendant who is merely guilty merits punishment. An individual whose appreciation and understanding are so overwhelmed by disease that he is declared "not guilty by reason of insanity" stands in need of treatment. However, 11 *Del.C.* §§ 401 and 408 reflect a legislative judgment that an individual whose willpower was undermined by disease should receive both treatment *and* punishment—treatment because he is ill and punishment because he might, in theory at least, have resisted the urge to commit the crime of which he has been convicted.

When viewed in light of the evidence presented at Sanders' trial, we believe that the jury's verdict of "guilty but mentally ill" amounted to a finding that Sanders' ability to refrain from committing murder was seriously undermined by his illness. All three experts who examined Sanders testified that he suffered from schizophrenia and that his disease produced highly disturbing hallucinations and delusions. Sanders' mother provided independent confirmation of the effect of Sanders'

condition on his thoughts and behavior. Finally, all three experts testified that Sanders lacked sufficient willpower to refrain from committing the crimes of which he was convicted.[7] Thus, the evidence on this question was wholly uncontroverted. It may be true that we cannot say whether Sanders literally could not resist the urge to kill Mr. Butler or whether he simply did not, but we can conclude, on the basis of the jury's verdict and the experts' testimony, that Sanders was mentally ill and that his illness gave rise to his compulsions and impaired his ability to resist them. The State's contention that the jury's verdict did not amount to a finding of volitional impairment is simply belied by the evidence presented to the jury. As an appellate court examining the larger legal implications of the jury's verdict, we must assume that the jury relied upon available evidence rather than its own unfounded diagnosis of Sanders' condition. Thus, for the purpose of analyzing the validity of Sanders' conviction and sentence, we accept the experts' testimony that Sanders suffered from a disease that impaired his volitional capacity. With the foregoing precepts in mind, we now turn to the specific questions raised by the defendant and the *amicus.*

### III

Sanders does not seek to invalidate his conviction on evidential grounds; indeed, he does not dispute the facts presented by the State. Rather, he argues that the "guilty but mentally ill" verdict, when viewed in light of the uncontradicted psychological and psychiatric evidence presented at trial, is inconsistent with the principle that a defendant's actions must be voluntary to be culpable. He also contends that 11 *Del.C.* § 408 is void for vagueness and provides constitutionally inadequate proce-

---

7. Notwithstanding the conceded inability of the psychiatric profession to determine with certainty whether an individual's behavior was wholly controlled by mental illness, the experts testified in absolute terms that Sanders had insufficient willpower to refrain from committing the crimes. We surmise that their testimony was affected by the language of section 401(b); the experts simply responded affirmatively to

questions posed by counsel that quoted from the statute. In light of our finding that section 401(b) covers a range of volitional impairments, we need not, even if we could, speculate on the exact extent to which Sanders' actions were controlled by mental illness. It is sufficient that we accept the experts' basic conclusion that mental illness seriously undermined Sanders' ability to refrain from killing Mr. Butler.

dural safeguards. Finally, he challenges the validity of certain jury instructions and argues that the trial court should have granted a mistrial after the State made reference to "crack" cocaine. The *amicus curiae* does not directly challenge the validity of Sanders' conviction, but rather launches a broad statutory and constitutional attack on Sanders' sentence, arguing that there is a fundamental inconsistency between the imposition of the death penalty and a verdict of "guilty but mentally ill."

### A.

■ Sanders first contends that the "guilty but mentally ill" sentencing statute, 11 *Del.C.* § 408, is unconstitutionally vague. His argument on this question is somewhat muddled. The doctrine of unconstitutional vagueness is applicable to statutes that proscribe criminal activities. A criminal statute is void for vagueness if it " 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,' " or if "it encourages arbitrary and erratic arrests and convictions." *Papachristou v. Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972) (overturning vagrancy ordinance) (quoting *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811–12, 98 L.Ed. 989 (1954)). 11 *Del.C.* § 408 does not itself criminalize any activities; it simply establishes mechanisms for sentencing, treating, and imprisoning persons who have been found "guilty but mentally ill." Thus, the statute cannot implicate the doctrine of unconstitutional vagueness.

■ Of course, any statute may be drafted in vague language, but inartful drafting does not give rise to a constitutional claim. Rather, it forces the courts that apply the ambiguous statute to construe its language. Sanders correctly points out that section 408(a), as enacted, arguably requires a jury to "examine[ ] all appropriate reports (including the presentence investigation)" and to "[hold] a hearing on the sole issue of the defendant's mental illness" before rendering a verdict of "guilty but mentally ill." He then contends that

he was deprived of due process because the jury neither examined any reports nor held a separate hearing. In *Daniels v. State*, Del.Supr., 538 A.2d 1104 (1988), however, we held that the hearing procedures of section 408(a) apply only when a defendant offers a plea of "guilty but mentally ill." A jury trial affords both parties a full opportunity to present evidence relevant to the defendant's mental condition. Since Sanders' trial was conducted in full conformity with this Court's construction of section 408, any flaw in the drafting of the statute provides him no basis for relief.

■ Sanders also appears to allege that the provisions of section 408(b) governing the transfer of a "guilty but mentally ill" prisoner from the Delaware State Hospital to a correctional facility provide inadequate procedural safeguards under the due process clause of the Fourteenth Amendment. The State responds that because Sanders has been in the custody of the Department of Correction since his sentencing and therefore has never been subjected to the transfer procedures, he has no standing to raise this claim. We agree. If, in fact, the transfer procedures create the danger of an erroneous deprivation of a cognizable interest, Sanders has not yet been subjected to that danger and thus may not yet challenge the adequacy of the procedures. Sanders' due process claim will become ripe only if he is ever transferred from a treatment facility to a correctional facility.

### B.

The *amicus curiae* raises a related claim, arguing that 11 *Del.C.* § 408(b) creates a right to receive treatment at the Delaware State Hospital or other psychiatric treatment facility. Section 408(b) clearly requires that "[t]he Commissioner [of the Department of Correction] shall ... confine [a defendant found 'guilty but mentally ill'] in the Delaware State Hospital." The statute further stipulates that the Hospital or "any other residential treatment facility to which the defendant is committed ... shall have the authority to discharge the defendant from the facility and return the defendant to the physical custo-

dy of the Commissioner whenever the facility believes that such a discharge is in the best interests of the defendant."

■ Because there is no evidence in the record that Sanders was ever confined in the State Hospital, it is arguable that Sanders' pattern of confinement has violated section 408(b). However, it appears that Sanders has been confined in a correctional facility because he has been viewed as a prisoner awaiting execution, rather than a prisoner subject to the terms of section 408(b). Given our ultimate decision to vacate Sanders' sentence, we find that if Sanders is ultimately sentenced to life imprisonment, he must be held in the State Hospital until the Hospital staff determines that confinement in a correctional institution would be in his best interests. On the other hand, if the jury, after appropriate instructions and specific findings as required by Part IV of this opinion, authorizes the imposition of the death penalty, Sanders is entitled to such treatment as may not be inconsistent with his status as a prisoner awaiting execution. As noted hereafter, the treatment of a mentally impaired prisoner awaiting execution is not necessarily incompatible with his status. While the statute gives the Commissioner jurisdiction over "all matters relating to security," it clearly reflects an intention to vest treatment decisions in the hands of mental health professionals, rather than prison officials.

The *amicus* argues that because it creates a right to treatment, section 408(b) does not reflect a legislative intent to authorize the execution of defendants found "guilty but mentally ill." The apparent inconsistency between the imposition of the death penalty and the punishment/treatment envisioned by the statute may be explained by its history. It is generally recognized that the State of Michigan was the pioneer in the establishment of the guilty but mentally ill verdict when it enacted such a law in 1975. *Daniels v. State*, 538 A.2d at 1108. The Michigan statute provided, as do all guilty but mentally ill statutes, that the defendant may be subjected to any sentence that could be imposed if he were simply found guilty. However, at the time Michigan adopted its guilty but mentally ill statute it did not have a death penalty, nor does it today. *See* Emanuel, *Guilty But Mentally Ill Verdicts and the Death Penalty: An Eighth Amendment Analysis*, 68 N.C.L. Rev. 37 (1989). Thus the prototype language under the Michigan statute authorizing "any sentence ... which may lawfully be imposed upon any defendant for the same offense" simply meant that a defendant would have any term of imprisonment imposed upon him which could be otherwise imposed. In enacting its statute, the Michigan legislators were not required to consider whether a guilty but mentally ill verdict with its resulting requirement of treatment and imprisonment would be consistent with the imposition of the death penalty.

■ The Delaware General Assembly, in adopting the Michigan statute, appears to have left open the question of whether it considered the death penalty in connection with the guilty but mentally ill verdict in requiring the imposition of penalty plus treatment. However, the statute clearly states that "a ['guilty but mentally ill'] defendant ... may have any sentence imposed on him which may lawfully be imposed upon any defendant for the same offense." We must accord to this unambiguous language its plain meaning. *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, Del.Supr., 492 A.2d 1242, 1246 (1985). Moreover, at the time the legislature acted, the constitutionality of capital punishment in its present statutory form had been upheld. *See State v. White*, Del.Supr., 395 A.2d 1082 (1978). Sanders was convicted of first-degree murder, and a sentence of death may lawfully be imposed upon a defendant convicted of that crime. As will be discussed hereafter, the punishment/treatment rationale underlying the statute may have significance in the jury's decision on whether or not to impose the death penalty, but, theoretically at least, the concept of treatment of a prisoner's mental disability is not inherently inconsistent with his execution. Therefore, we must conclude that the General Assembly intended to authorize the execution of de-

fendants such as Sanders. Whether it was constitutional for them to do so is, of course, another question, to which we shall turn in due course.[8]

### C.

■ Sanders next argues that the definition of mental illness in 11 *Del.C.* § 401(b) is patently inconsistent with 11 *Del.C.* §§ 242 and 243, which require that criminal liability be premised upon a voluntary act. Section 242 states:

A person is not guilty of an offense unless his liability is based on conduct which includes a voluntary act or the omission to perform an act which he is physically capable of performing.

"Voluntary act" is defined in section 243, which provides:

"Voluntary act" means a bodily movement performed consciously or habitually as a result of effort or determination, and includes possession if the defendant knowingly procured or received the thing possessed or was aware of his control thereof for a sufficient period to have been able to terminate his possession.

Sanders argues that a defendant who, under 11 *Del.C.* § 401(b), lacked the "willpower to choose whether he would do the act" with which he has been charged cannot be convicted, because his actions could not have been voluntary. Thus, Sanders contends that the definition of mental illness is fatally flawed, because it purports to allow the conviction both of individuals who are merely "substantially disturbed" and of individuals who are guilty of no crime at all. Sanders then argues that the jury should have been instructed to make specific findings as to the nature of Sanders' mental illness or, in the alternative, that the court should have directed an acquittal on the basis of uncontroverted evidence that Sanders suffered from a volitional impairment.

Sanders' argument is premised upon a misunderstanding of the voluntary act requirement contained in 11 *Del.C.* § 242. The voluntary act requirement has always been viewed as conceptually distinct from the insanity defense. *See generally* R. Perkins, *Criminal Law* 749–50 (2d ed. 1969). Section 242 calls for an evaluation of the nature of a defendant's actual, physical movements, while section 401 governs the mental state that lay behind the defendant's actions. Broadly speaking, section 242 goes to *actus reus*, while section 401 goes to *mens rea*. Thus, if one person is standing on a subway platform and a second person pushes him so that he runs into a third person, who in turn falls before a moving train, the second individual, rather than the first, may be charged with murder. The person who was pushed did not act as the result of his own effort, even though the movement of his body caused another person's death. He was merely the involuntary instrument of another person's criminal act. Similarly, if a driver has a heart attack and his car kills someone, the driver is guilty of no crime because he did not act consciously to cause the death. Other examples of involuntary acts would be reflexes, convulsions, and movements performed during sleep or epileptic seizure.

By contrast, the insanity defense focuses on the thinking that lay behind an individual's acts. An individual who meets the cognitive test must be acquitted even though he consciously and deliberately performs a criminal act because mental illness created the delusion that his wrongful acts were not wrongful. Similarly, in those States that recognize the volitional test of insanity, evidence of an "irresistible impulse" does not affect the conclusion that the defendant committed a wrongful act; it merely provides an excuse for the act's commission. Even if we assume that Sanders had absolutely no ability to refrain from killing, his actions would still be "voluntary," in the sense that they were per-

---

**8.** We do not now address the question of whether Sanders' post-sentencing mental state precludes imposition of the death penalty under the Eighth Amendment. The Supreme Court of the United States has recently questioned the constitutionality of executing a defendant who is mentally ill at the time of execution. *Perry v. Louisiana,* —— U.S. ——, 111 S.Ct. 449, —— L.Ed.2d —— (1990). We leave that question for another day.

formed consciously and as a result of effort.

The distinction between an involuntary act and an act caused by mental illness is, perhaps, a somewhat metaphysical one. In fact, the distinction has not always been drawn with precision. In *Wright v. State*, Del.Supr., 374 A.2d 824 (1977), a case decided by this Court at a time when Delaware still recognized the volitional test of insanity, a defendant charged with murder claimed that he had suffered from an epileptic seizure at the time of the killing. The State rebutted this claim with evidence that the defendant suffered from either a personality disorder or behavioral problems caused by drug and alcohol abuse. The trial judge instructed the jury on the then-current definition of insanity but did not provide instructions on the definition of a voluntary act. On appeal, we upheld the propriety of the judge's instructions, ruling that "[t]he additional instructions requested by defendant would have been cumulative, adding nothing to the jury's deliberative process." *Id.* at 832. Sanders relies upon this holding to support his claim that 11 *Del.C.* §§ 242 and 401(b) both govern defendants with volitional impairments.

However, even when Delaware recognized the volitional test of insanity, our law made a clear distinction between defendants who had not committed voluntary acts and defendants who suffered from volitional impairment occasioned by mental illness. A defendant acquitted because his acts were involuntary was not confined or restricted. A defendant found "not guilty by reason of insanity" must be committed in a mental institution until it is determined that he poses no threat to society. If, as Sanders claims, section 242 provides a basis for acquitting mentally ill individuals, there would be nothing to prevent such individuals from returning to society. It should be obvious that the General Assembly, in enacting section 242, did not intend to permit potentially violent mental patients to avoid necessary treatment and confinement.

Moreover, the General Assembly's 1982 amendments to section 401 reveal a clear intention to eliminate the volitional test of insanity from the law of this State. *Daniels*, 538 A.2d at 1110. The amended statutes view evidence of volitional impairment as grounds for both punishing and treating a defendant, rather than merely treating him. Although the evidence of Sanders' condition and the jury's verdict should be viewed as proof that Sanders suffered from a disease that affected his ability to control his behavior, it cannot be said that his impairment was total. Since it is clear that Sanders could not have been acquitted under section 242, we find no error in the trial judge's decision not to instruct the jury on the definition of a voluntary act.

### D.

■ Next, Sanders questions the propriety of certain instructions given to the jury by the trial judge. First, he challenges the judge's decision to instruct the jury that they could not find insanity or mental illness if the condition were proximately caused by drug or alcohol use. Sanders argues that because the experts had rebutted the State's suggestion that Sanders' behavior had been caused by a reaction to marijuana use, the instruction was unsupported by available evidence. Although a substantial body of evidence supported Sanders' contention that marijuana played no role in influencing his behavior, the State did show that Sanders had used marijuana and introduced some evidence that marijuana could produce a toxic reaction that would affect behavior. Thus, the role of marijuana in causing Sanders' behavior was at least put at issue. Moreover, any claim of prejudice arising from the instruction must be discounted, since the jury rejected the State's contention that Sanders' behavior was caused by drug abuse when it found Sanders "guilty but mentally ill."

■ Second, Sanders argues that the trial judge erred by referring to a verdict of "guilty but mentally ill" as an affirmative defense in his jury instructions. In two instances, the judge used the word "defenses" when referring collectively to the defense of insanity and the verdict of "guilty but mentally ill." Although a plea,

and subsequent verdict, of "guilty but mentally ill" does not constitute a "defense" to criminal liability, since it subjects the defendant to punishment for his acts, the judge's oblique use of the term "defenses" was clearly harmless error. The record reveals that the judge took great pains to distinguish between the defense of insanity and the verdict of "guilty but mentally ill." Thus, his slight misstatement would not have led a reasonable juror to believe that a verdict of "guilty but mentally ill" would excuse Sanders from criminal liability. Jury instructions must be read in their entirety, and a claim of error may not be predicated upon a single word or phrase taken out of context. *Deputy v. State,* Del.Supr., 500 A.2d 581, 596 (1985), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1589, 94 L.Ed.2d 778 (1987).

 Finally, both Sanders and the *amicus curiae* contend that the trial court erred in instructing the jury that they could render a verdict of "guilty but mentally ill" only if Sanders proved by a preponderance of the evidence that he was mentally ill. They argue that the State should have been required to prove mental illness beyond a reasonable doubt. The logic of this argument escapes us. The court correctly instructed the jury that the State must prove guilt beyond a reasonable doubt before a verdict of "guilty" or "guilty but mentally ill" could be rendered. It also instructed the jury that the defendant must prove insanity by a preponderance of evidence before a verdict of "not guilty by reason of insanity" could be rendered. This allocation of proof conforms to the language of 11 *Del.C.* § 401(a) which designates mental illness as an "affirmative defense." Thus, the jury clearly found that the State had carried its burden of proving that Sanders had committed the criminal acts with which he had been charged and that Sanders had not carried his burden of proving insanity. We presume that a verdict of "guilty but mentally ill" rather than simply "guilty" is of benefit to the defendant, since it affords

him a right to treatment and might, in theory, weigh in favor of a lighter sentence. Certainly, such a verdict offers no special benefit to the State; if the burden of proving mental illness were placed upon the State, it would never undertake that burden, and defendants such as Sanders would always be found "guilty" rather than "guilty but mentally ill." [9] Arguably, the law might place the burden of *disproving* mental illness upon the State after the defendant had made a *prima facie* showing, but neither Sanders nor the *amicus* makes such a claim; indeed, they cannot, since the jury's finding of mental illness would render it moot.

**E.**

 Finally, Sanders argues that the trial judge erred in failing to grant a mistrial after the State referred to "crack" cocaine during its questioning of Dr. Weintraub and during its closing remarks. In attempting to establish that Sanders' behavior was caused by marijuana use, the State asked Dr. Weintraub:

> You indicated that you didn't see any evidence of a long-term use of alcohol or other drugs that would cause a toxic problem. Isn't it true that in addition to perhaps the residual buildup from long-term use[,] the toxic reaction can be to a single use[,] much as we see with people today with this crack ...?

Later, during the closing argument, the State said:

> I made reference to crack. There is no connection between crack and this defendant. The purpose of asking that question is to clarify the question to Dr. Weintraub but also I have never known anybody to commit—you never read in the paper about a person who commits a crime because they took crack. They die. Not everybody who does crack does die. One time is enough for some people who have an extreme reaction.

**9.** Indeed, it seems unlikely that the defendant would ever set out to prove to a jury that he was "guilty but mentally ill." Rather, as was the case here, a jury is likely to render such a verdict when the defendant attempts to prove nonresponsibility due to insanity but succeeds only in proving mental illness.

Sanders contends that the statements were a baseless attempt to link Sanders to cocaine use, and that because "crack" is recognized as a highly dangerous drug by the general public, the references were prejudicial. However, the trial judge instructed the jury that no evidence linked the defendant to cocaine use and that the references had been made for illustrative purposes only. Under the circumstances, these instructions were sufficient to cure any possible prejudice. Indeed, the State reiterated the limiting instructions in its own closing statement, and even undercut its own arguments by suggesting that drug use is more likely to cause the user's death than to encourage criminal acts. Finally, the jury clearly was not prejudiced by the references, since its verdict was legally inconsistent with the State's allegations that drug use influenced Sander's actions.

### F.

In sum, we find no merit in Sanders' challenges to the guilt phase of his trial. 11 *Del.C.* §§ 401 and 408 do not suffer from the infirmities that Sanders alleges and the trial judge conducted the proceedings in full conformity with applicable law.

### IV

Under Delaware law, a sentence of death may be imposed only under the bifurcated procedure prescribed by 11 *Del.C.* § 4209. The Delaware death penalty statute is based on that approved by the United States Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) and requires the jury to engage in a two step analysis in order to impose a death sentence. The jury must (1) make an initial finding of at least one statutory aggravating circumstance and (2) weigh such factor(s) against any mitigating circumstances found to exist. 11 *Del.C.* § 4209(d)(1). Unless the jury unanimously concludes that the aggravating circumstances outweigh the mitigating circumstances, the death penalty cannot be imposed. *Whalen v. State,* Del.Supr., 492 A.2d 552, 560 (1985).

As previously noted, the jury in this case was instructed that it could find an aggravating circumstance if it unanimously accepted the State's contention that "the victim was 62 years of age or older." In view of the fact that this contention was undisputed, the jury's finding of an aggravating circumstance was inevitable. The trial court did not specify any mitigating circumstance nor did it refer to any defense contention regarding a mitigating circumstance.[10] The court did recite the statutory definitions of both aggravating and mitigating circumstances. It defined the latter as "any factor relating to the 'crime or to the offense which tends to make the defendant's conduct less serious or the imposition of a penalty of death inappropriate."

At trial, the defense did not request a specific instruction with respect to the definition of mitigating circumstances nor did it raise any objection to the instructions as given by the court. Since Sanders did not voice an objection to any portion of the trial court's instruction during the penalty phase, we would generally decline to consider any claim of error simply because it was not fairly presented to the trial court

---

**10.** The contrast between the emphasis placed on the aggravating circumstance and the lack of any mention as a specific mitigating circumstance in this case was highlighted by the interrogatories submitted to the jury:

INTERROGATORIES TO JURY

1. DOES THE JURY UNANIMOUSLY FIND THAT THE FOLLOWING STATUTORY AGGRAVATING CIRCUMSTANCE EXISTS?

The victim was 62 years of age or older.
YES___ NO___

2. DOES THE JURY UNANIMOUSLY FIND THAT THE AGGRAVATING CIRCUMSTANCE(S) OUTWEIGH THE MITIGATING CIRCUMSTANCES?
YES___ NO___

3. DOES THE JURY UNANIMOUSLY RECOMMEND THAT A SENTENCE OF DEATH BE IMPOSED?
YES___ NO___
(If the answer to question 3 is "No," answer question 4.)

4. DOES THE JURY UNANIMOUSLY RECOMMEND THAT A SENTENCE OF LIFE IMPRISONMENT BE IMPOSED?
YES___ NO___
(If the answer to question 4 is "No," answer question 5.)

5. IS THE JURY UNABLE TO REACH A UNANIMOUS VERDICT?

in the first instance. Supr.Ct.R. 8. Nonetheless, this Court will review an issue not raised at the trial level if it constitutes plain error.

Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process. Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice.

*Wainwright v. State,* Del.Supr., 504 A.2d 1096, 1100 (1986).

■ Because the error complained of here relates to the deficiency of instructions in the penalty phase of a capital murder trial, we consider such error to be of constitutional dimension. Moreover, in view of the resulting imposition of capital punishment, we consider that such error is clearly fundamental in character and deprived the defendant of a substantial right. Accordingly, we review such a claim under a plain error standard.

■ Sanders and the *amicus* argue that in a capital case, with its heightened requirements of fairness, the jury must receive guidance and specific instructions beyond a mere reading of the death penalty statute. We agree with this general statement. Its application here requires that a jury which proceeds to a punishment hearing following a guilty but mentally ill verdict must be made aware of the significance of its verdict, which constitutes a finding that the defendant's mental illness contributed to his culpability. Certainly in this case, in view of the uncontroverted expert testimony, there can be little doubt that the defendant's mental illness, even if not sufficient to exculpate him from responsibility, played a causative role. At a minimum, a finding of guilty but mentally ill established a level of mitigation which the jury must take into consideration in fixing punishment.

■ The importance of accurate and complete jury instructions in a capital case, particularly in the penalty phase, need hardly be emphasized. This Court has noted that jury instructions "play a critical role in the penalty phase of a capital case." *Whalen v. State,* 492 A.2d at 559. Where the jury performs the role of sentencer, it functions beyond its fact finding role; it partakes of a duty normally performed by a judicial officer to "express the conscience of the community on the ultimate question of life or death." *Witherspoon v. Illinois,* 391 U.S. 510, 519, 88 S.Ct. 1770, 1775, 20 L.Ed.2d 776 (1968). It is constitutionally required therefore that the jury be fully informed on "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978). Such consideration by the jury is a "constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).

■ Following a guilty but mentally ill verdict or plea in a non-capital case, a sentencing judge would be required to base his sentence on the implicit findings of both criminal responsibility and mental illness. *Daniels v. State,* 538 A.2d at 1108. Any such sentence would include the benefit of treatment as part of the punishment mode. Here, however, a sentencing jury was not given the benefit of the guilty but mentally ill rationale for sentencing nor given any insight into its fundamental purpose. The defendant facing the death penalty after a guilty but mentally ill verdict before an uninformed jury is thus afforded fewer protections than those available to a non-death penalty defendant awaiting sentencing by a judge after the same verdict. The failure to afford a defendant the same benefits when the jury fixes the penalty as would occur when the court imposes sentence would render the guilty but mentally ill verdict as the basis for the arbitrary infliction of death in violation of the Eighth Amendment of the Federal Constitution

and the Delaware constitutional provision against unusual punishment. Moreover, the imposition of the death penalty following a guilty but mentally ill verdict where the jury is not instructed concerning the significance of its verdict would run afoul of the requirement of proportionality. *See infra* Part V.C. Unless the jury is required to focus upon the significance of its modified finding of guilt there is an unacceptable risk that a defendant such as Sanders would receive the same punishment as that imposed on a defendant after an ordinary verdict of guilty. Such a result, in effect, blurs the clear statutory distinction between a guilty but mentally ill verdict under 11 *Del.C.* § 401(b) and the ordinary guilty verdict which sanctions the imposition of the death penalty under 11 *Del.C.* § 4209.

Sanders' condition unquestionably distinguishes his degree of culpability from that of the defendant who purposefully decides to take another life. Sanders' mind was touched by a disease which slowly dragged him into the depths of irrationality, transforming him from a well-adjusted teenager into a brooding and troubled young adult. It made him engage in strange, compulsive behavior and it distorted his perception of reality. It tormented him with hallucinations and bizarre fantasies. In the end, it drove him to commit a tragic and senseless crime of violence. As the psychiatric experts testified and as the jury found, Sanders' ability to choose whether or not he would commit that crime was significantly altered by his illness. The culpability of mentally ill defendants may vary widely, but it is certainly at a low ebb when a defendant kills only because he is mentally ill. Nor is this conclusion affected by our inability to calibrate the exact extent of Sanders' volitional impairment. The fact that Sanders might, in theory, have resisted his pathological impulses provides a justification for punishment. The fact that his perceptions and actions were affected by such impulses may greatly weaken the justification for capital punishment, however.

Accordingly, in order for the constitutionality of the guilty but mentally ill statute to be upheld, it is essential that the judge instructing the jury in the punishment phase of a capital case advise the jury concerning the mitigating effect of a finding of guilty but mentally ill, as contrasted with the findings implicit in an ordinary guilty verdict. At a minimum, it would appear that this would require that the jury be instructed that a finding of guilty but mentally ill establishes mitigation as a matter of law just as the jury's finding in the guilt phase of a statutory aggravating circumstance would satisfy the first step of the two part analysis required for the imposition of the death sentence. *Whalen v. State*, 492 A.2d at 560. Additionally, the jury must be instructed that 11 *Del.C.* §§ 401 and 402 reflect a legislative judgment that an individual found guilty but mentally ill should receive both treatment and punishment, although such consideration would not preclude the imposition of the death penalty if the aggravating circumstance(s) already determined to exist outweighed the mitigating effect of the defendant's mental illness. Finally, in order to assure that the jury has focused specifically on the effect of its guilty but mentally ill verdict in the penalty determination, it should be required to answer a specific interrogatory as to whether it finds the impairment of volitional capacity to be a mitigating circumstance.

We recognize that because this case represented the first instance in which a guilty but mentally ill verdict was returned in a capital case, the significance of special jury instructions may not have been apparent to the court or to defense counsel. Nonetheless, in view of the fundamental change in the law of mental illness which the guilty but mentally ill verdict has accomplished, a jury may not impose the death penalty without being made aware of the difference between that verdict and an ordinary guilty verdict on the defendant's mental state at the time of the offense. We view the absence of such instructions in this case as plain error. Accordingly, we must set aside the death penalty imposed

by the jury and remand the matter to the Superior Court for a new penalty hearing.

## V

Although our determination of plain error concerning the jury instructions in the penalty phase requires a remand for a new penalty hearing, we are nonetheless required to address the *amicus'* contention that the imposition of the death penalty following a "guilty but mentally ill" verdict is unconstitutional even under appropriate instructions. We have already concluded that 11 *Del.C.* § 408(b) reflects a legislative intent to permit the execution of defendants found "guilty but mentally ill." The *amicus curiae* argues that the Eighth Amendment to the United States Constitution [11] forbids the imposition of a death sentence upon a defendant who has been found "guilty but mentally ill" under 11 *Del.C.* § 401(b). Alternatively, the *amicus* contends that it is constitutionally impermissible to impose such a sentence upon a defendant who committed a murder as the result of a mental illness that left him with "insufficient willpower to choose whether" or not he would commit the crime with which he was charged. As we have already established, when the verdict of the *Sanders* jury is examined in light of all evidence on the record, it constitutes a finding that Sanders' volitional capacity was impaired by mental illness. Therefore, it is necessary for us to consider only whether it is unconstitutional to execute a defendant such as Sanders. We do not address the broader question of whether a death sentence imposed upon any mentally ill defendant would be valid. Even with the focus of our analysis so narrowed, however, we are required to confront novel questions in a complex and unsettled area of constitutional law.

■■■ Without question, the Supreme Court of the United States has never examined the issues that are before us today. In two cases, *People v. Crews*, 122 Ill.2d 266, 119 Ill.Dec. 308, 522 N.E.2d 1167 (1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3260, 106 L.Ed.2d 605 (1989) and *Harris v. State,* Ind.Supr., 499 N.E.2d 723 (1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987), the Supreme Court has declined to review death sentences imposed upon defendants who were found "guilty but mentally ill." Of course, a denial of certiorari carries no precedential weight. *Maryland v. Baltimore Radio Show, Inc.,* 338 U.S. 912, 917–19, 70 S.Ct. 252, 254–55, 94 L.Ed. 562 (1950) (opinion of Frankfurter, J., respecting denial of petition for writ of certiorari). Moreover, the facts of those cases markedly distinguish them from the case before us. In both, the defendants plead "guilty but mentally ill," rather than being found "guilty but mentally ill" by a jury. Their pleas were accepted by the trial courts in question after the judges heard conflicting expert testimony concerning the nature and extent of the defendants' illnesses. Thus, the defendants' actual mental state was open to question. Moreover, both courts specifically found that there was no evidence that either defendant suffered from any volitional impairment. Thus, the courts were asked whether a defendant whose ability to conform his conduct to the law's requirements was not in question, but who was nonetheless mentally ill, could be executed. Both courts found that he could. We must answer a related question, but one posed on a significantly different record.

Although the United States Supreme Court has upheld the death penalty itself against Eighth Amendment challenge, *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion), it has recognized that execution is "unique in its severity and irrevocability." *Id.* at 187, 96 S.Ct. at 2931–32. Accordingly, the Court has separately considered the constitutionality of imposing the death penalty upon certain classes of offenders, *e.g.,* *Thompson v. Oklahoma,* 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (plurality

---

11. "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment is made binding upon the States through the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

opinion) (unconstitutional to execute defendant who committed crime at age of fifteen), or as the punishment for certain crimes, *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (plurality opinion) (unconstitutional to execute defendant convicted of rape). Moreover, it has enunciated the standards against which the constitutionality of imposing the death penalty upon a given defendant must be tested. However, the continued constitutional viability of some of these standards has been challenged by several members of the Court; the large number of plurality and dissenting opinions in the Court's death penalty jurisprudence underscores the difficulties inherent in this controversial area. Thus, because the Court has never directly addressed the precise questions that we face today, its existing precedents provide uncertain guidance.

▇▇▇▇ At a minimum, the Eighth Amendment forbids the infliction of punishments that were considered cruel and unusual at the time of the adoption of the Bill of Rights. *Solem v. Helm*, 463 U.S. 277, 285–86, 103 S.Ct. 3001, 3007, 77 L.Ed.2d 637 (1983). If the common law did not support the execution of a given class of defendants, the Constitution now forbids it. *See, e.g., Ford v. Wainwright*, 477 U.S. 399, 406–408, 106 S.Ct. 2595, 2600–01, 91 L.Ed.2d 335 (1986) (execution of prisoner who had become insane after sentencing impermissible at common law). Moreover, to allow the Eighth Amendment's protections to keep pace with the "evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion), the Court has considered society's current views of a particular punishment. In analyzing contemporary standards, the Court has relied primarily upon an examination of legislation enacted throughout the nation. *See, e.g., Thompson*, 108 S.Ct. at 2692–96. Finally, the Court has held that imposing the death penalty upon a given class of offenders is impermissible if it is disproportionate to the defendant's crime or if it "makes no measurable contribution to acceptable goals of punishment and hence is nothing more than

the purposeless and needless imposition of pain and suffering." *Coker*, 433 U.S. at 592, 97 S.Ct. at 2866 (plurality opinion).

## A.

The historical basis for sheltering at least some mentally ill defendants from the full reach of the criminal law is extensive. As early as the fourteenth century, the English king regularly pardoned a defendant who committed a crime while of unsound mind. R. Perkins, *Criminal Law* 850–51 (2d ed. 1969). Such a defendant could be found guilty but was considered unsuitable for punishment. "[B]y intendment of Law the execution of the offender is for example, ... but so it is not when a mad man is executed, but should be a miserable spectacle, both against Law, and of extream inhumanity and cruelty, and can be of no example to others." 3 E. Coke, *Institutes of the English Law* 6 (6th ed. 1680). Over time, the tradition of extending mercy to the insane was transformed into a formal defense. As an eighteenth century judge explained, "If a man be deprived of his reason and consequently of his intention he cannot be guilty." *Rex v. Arnold*, 16 Howell State Trials 695, 764–65 (Eng.1724). Or as Blackstone wrote, "[I]diots and lunatics are not chargeable for their own acts, if committed when under these incapacities.... [A] total idiocy, or absolute insanity, excuses from the guilt, and of course from the punishment, of any criminal action committed under such deprivation of the senses...." 4 W. Blackstone, *Commentaries on the Laws of England* 24–25 (Sharswood ed. 1882) (1st ed. 1769). Thus, by the time of the enactment of the Bill of Rights in 1789, it was well established that courts must consider a defendant's state of mind when trying and sentencing him.

Nevertheless, the limits of criminal culpability established at common law are simply the precursors of the modern insanity defense. The common law established the practice of attempting to draw a bright line between the sane and the insane; there is no evidence that a mentally disturbed defendant who fell on the wrong side of that

line was entitled to any special consideration. If a defendant was insane, he was fully shielded from the law, but if he was sane, he was fully liable to be charged, tried, and executed. Moreover, as is reflected by the use of pejorative terms such as "lunatic" and "madman," the common law definition of insanity was even more restrictive than modern ones. In 1603, Coke approved a definition of insanity that dated to the thirteenth century: "A madman (furiosus) is one who does not know what he is doing, who lacks in mind and reason and is not far removed from the brutes." *Beverley's Case,* 76 Eng.Rep. 1118, 1121 (1603) (quoting Bracton). In 1724, the court in *Rex v. Arnold* offered a similarly narrow definition. "[I]t is not every kind of frantic humor ... that points him [a defendant] out to be such a madman as is to be exempted from punishment: it must be a man that is totally deprived of his understanding and memory, and doth not know what he is doing, no more than an infant, than a brute, or a wild beast, such a one is never the object of punishment...." 16 Howell State Trials at 764–65. Blackstone wrote of "a defective or vitiated understanding" and a "deprivation of the senses." 4 W. Blackstone, *supra,* at 24–25. Something akin to the modern cognitive test did begin to appear in the eighteenth century, although it did not become firmly established in English law until *M'Naghten's Case* in 1843. *See* 1 W. Hawkins, *Pleas of the Crown* 1–2 (7th ed. 1795) ("[T]hose who are under a natural disability of distinguishing between good and evil, as ... ideots, and lunaticks are not punishable by any criminal prosecution whatsoever.")

■ The Supreme Court's recent opinion in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), provides some guidance in determining the constitutional implications of this common law tradition. In *Penry,* the Court considered whether the Eighth Amendment bars the execution of a mentally retarded defendant. The Court began its analysis by examining the common law prohibition against punishing "idiots." *Id.* 109 S.Ct. at 2953–54. The common law viewed "idiocy," together with "lunacy," as a form of insanity. Thus, the line of culpability was the same for the retarded and the mentally ill. The retarded defendant who suffered from "a total lack of reason or understanding, or an inability to distinguish between good and evil," *id.* at 2953, could not be punished; all others could be. The Court speculated that "[t]he common law prohibition against punishing 'idiots' for their crimes suggests that it may indeed be 'cruel and unusual' punishment to execute persons who are profoundly or severely retarded and wholly lacking the capacity to appreciate the wrongfulness of their actions." *Id.* at 2954. By the same reasoning, it could be argued that some sort of insanity defense is constitutionally compelled, although the Supreme Court has never held that it is. Indeed, since the Court appears to recognize a defense for those who cannot "distinguish between good and evil" as part of our common law heritage, it could be argued that the cognitive test constitutes the constitutional minimum, a quantum of protection that all States must afford to the mentally ill. However, in *Penry,* the Court found that common law limits on punishing "idiots" had been subsumed within the modern insanity defense, which "generally includes 'mental defect' as well as 'mental disease' as part of the legal definition of insanity." *Id.* (citing Model Penal Code definition).[12] Since the jury that tried Penry had rejected his insanity defense, it followed that his "mental defect" was not so severe that it would have exempted him from punishment at common law. Similarly, in this case a jury found that Sanders was not insane within the meaning of the cognitive test. The standard according to which he was judged was at least as expansive as

**12.** The impact of this holding upon the recent decision of several States to abolish the insanity defense has never been addressed by the Supreme Court. However, the highest courts of two states have ruled that the due process clause does not require the states to provide a criminal defendant with an independent defense of insanity. *Montana v. Korell,* 213 Mont. 316, 690 P.2d 992 (1984); *Idaho v. Seary,* Idaho Supr., No. 127–1990, decided Sept. 5, 1990.

any definition used at early common law. Accordingly, we must conclude that under eighteenth century standards, it would not have been "cruel and unusual" to sentence him to death.

The common law also placed limitations upon the power to execute a prisoner who became insane after he had been sentenced. *See* 4 W. Blackstone, *supra*, at 24–25. The common law practice is reflected in modern procedures used to evaluate a prisoner's competence after he has been sentenced. *See, e.g.*, 11 *Del.C.* § 406. In *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), the Supreme Court recognized that these limitations were incorporated in the Eighth Amendment. However, the Court did not clearly delineate a standard for determining what class of symptoms would bar execution. In his concurrence, Justice Powell canvassed the historical evidence and concluded that the relevant standard, both at common law and now, is whether the condemned prisoner is "[ ]aware of the punishment [he is] about to suffer and why [he is] to suffer it." *Ford*, 477 U.S. at 422, 106 S.Ct. at 2608 (Powell, J., concurring in part and concurring in the judgment). The Court cited this definition with approval in *Penry*, 109 S.Ct. at 2954. Thus, while the Court has never established a constitutional standard for the insanity defense, it appears to have accorded constitutional stature to the common law definition of competence to be executed. As was true with the insanity defense, however, a defendant's mental illness must be considered irrelevant for this purpose unless it brings him within the scope of the definition. Neither Sanders nor the *amicus* has argued that Sanders' present mental condition meets this test. Accordingly, we must conclude that the common law rule recognized in *Ford* provides no basis for disturbing Sanders' sentence.

**B.**

■ The utility of defining "cruel and unusual punishment" with reference to the common law is limited. Various methods of punishment, such as flogging and branding, that were deemed acceptable in the eighteenth century have since been rejected by all of enlightened society. Moreover, determining the exact scope of common law protections is an uncertain process. The Eighth Amendment is not, therefore, "bound by the sparing humanitarian concessions of our forebears." *Ford*, 477 U.S. at 406, 106 S.Ct. at 2600. Rather, because the Amendment protects "fundamental human dignity," it must embrace the contemporary understanding of what is acceptable and what is barbarous. *Id.* Of course, modern standards of decency may prove almost as difficult to divine as eighteenth century ones. Accordingly, in seeking objective evidence of popular values, the Supreme Court has relied primarily upon the legislation enacted by the people's elected representatives.[13] Therefore, we must determine whether Sanders' execution would be barred in a sufficiently large number of jurisdictions to warrant the conclusion that it would be found unconstitutional.[14]

In *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), the Court declined to include States that do not authorize capital punishment at all in its catalogue of States that bar the execution of sixteen and seventeen year olds. The Court argued that including such States would be "rather like discerning a national consensus that wagering on cockfights is inhumane by counting within that consensus those States that bar all wagering." *Id.* 109 S.Ct. at 2975 n. 2. We must admit to finding this reasoning somewhat opaque. If one sought to discern a national consensus that cockfighting is inhumane, one would certainly look to States that outlaw cruelty to animals. Similarly, if a State has abolished capital punishment, it follows

---

**13.** The Court has also analyzed evidence of the sentencing behavior of juries throughout the nation. However, none of the parties has provided us with the statistical evidence that would allow us to conduct such analysis. *Cf. Penry*, 109 S.Ct. at 2955.

**14.** We consider fifty-two jurisdictions: the fifty States, the District of Columbia, and the United States.

*a fortiori* that that State has rejected the execution of sixteen year olds, the mentally ill, the mentally retarded, or any definable class of defendants. However, because *Stanford* represents the Court's current mode of Eighth Amendment analysis, we feel compelled to examine only States that authorize capital punishment.[15] Of the thirty-seven jurisdictions that fit into this category, twelve provide an absolute defense to a defendant whose condition falls within the scope of the volitional test.[16] It is quite probable that if Sanders had been tried in one of these jurisdictions, he would not have been convicted, let alone sentenced to death. However, the relevance of this statistic is again limited by the logic of *Stanford.* The fact that certain States that have the death penalty also recognize the volitional defense does not reflect a legislative judgment that although defendants such as Sanders may be punished, they may not be executed; rather, it reflects a judgment that they are guilty of no crime. It is evidence of the acceptance that a particular definition of insanity has achieved throughout society, but not of how society views the execution of offenders such as Sanders who are convicted in States that do not recognize the volitional test as evidence of insanity. Thus, we must consider two distinct questions: (1) Has society firmly embraced the volitional test of insanity? and (2) If not, has society nevertheless rejected the execution of offenders who fit that test?

The answer to the first question is clearly "no." The Supreme Court has repeatedly declined to examine the insanity defense in constitutional terms. *Jones v. United States,* 463 U.S. 354, 364 n. 13, 103 S.Ct. 3043, 3050 n. 13, 77 L.Ed.2d 694 (1983); *Powell v. Texas,* 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968); *Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952). As we have already noted, there may be an historical basis for arguing that it would be cruel and unusual to execute, or even to punish, an individual who could not distinguish right from wrong. The Court apparently considers the cognitive test to be part of our common law tradition, *Penry,* 109 S.Ct. at 2953–54, and almost all jurisdictions have long recognized the test as a valid standard of culpability. Even so, the Court has never held that the test has any Eighth Amendment significance. Moreover, the Court explicitly rejected the argument that the volitional test of insanity has constitutional stature as recently as 1968. *Powell,* 392 U.S. at 535–37, 88 S.Ct. at 2155–57; *Leland,* 343 U.S. at 800–01, 72 S.Ct. at 1008–09. Little has changed in twenty-two years that would upset that holding. Of fifty-two jurisdictions, twenty recognize the volitional test as a defense to criminal liability.[17] This number falls far short of the virtual unanimity that the Court has required before declaring a punishment cruel and unusual in light of contemporary values. Moreover, it represents a substantial *decrease* from the number of jurisdictions that recognized the volitional test before the 1980s.

The Court's reluctance to bring the Federal Constitution to bear upon the problem of defining insanity stems in large part

---

**15.** The fifteen jurisdictions that do not authorize capital punishment are: Alaska, the District of Columbia, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, New York, North Dakota, Rhode Island, Vermont, West Virginia, and Wisconsin. For relevant citations, see *Thompson,* 108 S.Ct. at 2694 n. 25; *Stanford,* 109 S.Ct. at 2983 n. 1 (Brennan, J., dissenting).

**16.** Eleven States recognize the volitional test itself. Ark.Stat. Ann. § 5–2–312; Conn.Gen. Stat. Ann. § 53a–13; Ill. Ann. Stat. ch. 38, 6–2; Ky.Rev.Stat. Ann. § 504.020; Md. Health–Gen. Code Ann. § 12–108; Mo. Ann. Stat. § 562.086; N.M.Stat. Ann. § 31–9–3; *State v. Grimsley,* 3 Ohio App.3d 265, 444 N.E.2d 1071 (1982); Or. Rev.Stat. § 161.295; Tenn.Code Ann.

§ 39–11–501; Wyo.Stat. § 7–11–304. In addition, New Hampshire recognizes a defense for any defendant whose criminal acts are the product of mental illness. This definition would embrace the volitional test. *See State v. Abbott,* 127 N.H. 444, 503 A.2d 791 (1985).

**17.** In addition to the jurisdictions listed in note 15, *supra,* the volitional test is recognized by: *United States v. Brawner,* D.C.Cir., 471 F.2d 969 (1972); Haw.Rev.Stat. § 704.400; *Commonwealth v. Goulet,* 402 Mass. 299, 522 N.E.2d 417 (1988); Mich.Stat.Ann. § 28.1044(1); *State v. Johnson,* 121 R.I. 254, 399 A.2d 469 (1979); Vt. Stat.Ann. tit. 13, §§ 4801, 4802; *State v. Massey,* W.Va.Supr., 359 S.E.2d 865 (1987); Wisc.Stat. Ann. § 971.15.

from concerns of federalism. As the Court explained in *Powell:*

Nothing could be less fruitful than for this Court to be impelled into defining some sort of insanity defense in constitutional terms.... The experimentation of one jurisdiction [the District of Columbia] in that field alone indicates the magnitude of the problem. But formulating a constitutional rule would reduce, if not eliminate, that fruitful experimentation, and freeze the developing productive dialogue between law and psychiatry into a rigid constitutional mold. It is simply not yet the time to write the Constitutional formulas cast in terms whose meaning, let alone relevance, is not yet clear either to doctors or to lawyers.

392 U.S. at 536–37, 88 S.Ct. at 2156–57 (citations omitted). In short, the Court has determined that at least until advances in psychiatry allow the States to define the limits of criminal responsibility with something like precision, the States must be free to experiment with varying standards. Even if all or nearly all jurisdictions adopted the volitional test, it is unlikely that the Court would immediately set it in constitutional cement.

We now consider the extent to which the execution of a defendant such as Sanders would be barred in States that allow capital punishment but that do not recognize the volitional test of insanity.[18] The Supreme Court has held that the sentencer in a capital case must be allowed to consider, " 'as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978) (plurality opinion)). Thus, all States must allow evidence of mental illness to be offered in mitigation of sentence, regardless of their definition of insanity. Moreover, those States that specify statutory mitigating factors all include mental illness on their lists. However, no jurisdiction has explicitly outlawed the execution of any variety of mentally ill defendants who are not legally insane. Indeed, the very fact that mental illness not constituting insanity is considered a mitigating circumstance is proof that the execution of the mentally ill is a legal possibility in all States that have a death penalty, since any defendant may be sentenced to death if aggravating factors outweigh mitigating ones.[19] In other words, while the existence of a mitigating factor makes it less likely that the death penalty will be imposed, aggravating circumstances may always be found to predominate.[20]

All States must allow mental illness to be weighed in the balance, but none has yet mandated that it automatically tip the

18. We again hesitate to frame our analysis in such narrow terms. Fifteen jurisdictions have abolished capital punishment altogether, and an additional twelve recognize the volitional test of insanity. Thus, in twenty-seven of fifty-two jurisdictions, Sanders could not legally be executed. Although none of these jurisdictions has *directly* outlawed the execution of a defendant such as Sanders, their existing legislation is clear evidence that they would if they had any reason to. However, those jurisdictions that have abolished capital punishment have no reason to outlaw the execution of any given class of offender since to do so would be wholly superfluous. Similarly, those jurisdictions that forbid *any* punishment of defendants such as Sanders would have no reason to specify that they cannot be executed. Twenty-seven jurisdictions probably does not constitute a national consensus, but we find it hard to conclude that it is of no significance whatsoever. However, the cramped analytical framework of *Stanford* forces us to do just that.

19. In *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the fact that six States made vicarious felony murder a mitigating circumstance "weigh[ed] on the side of rejecting capital punishment for the crime at issue." *Id.* at 791–93, 102 S.Ct. at 3373–74. However, the Court did not rely heavily upon its statutory analysis. Moreover, *Stanford* would seem to preclude reliance upon such evidence in the future.

20. There is even the concern that some juries may treat mental illness as if it were an *aggravating* circumstance, reasoning that the mentally ill have a propensity to commit violent acts and therefore deserve to die. *See* Note, *Mental Illness as an Aggravating Circumstance in Capital Sentencing,* 89 Colum.L.Rev. 291 (1989).

scales. In those States that do not recognize the volitional test, mental illness that impairs volition is no different from any other variety of mental illness. While a defendant such as Sanders would be less likely than a healthy defendant to be sentenced to death in any of these States, a death sentence would be a legal possibility in all of them. Accordingly, we must conclude that a national consensus against executing defendants such as Sanders has not emerged.

## C.

We now turn to the task of examining the logical foundation of Sanders' sentence to determine if there is " 'a nexus between the punishment imposed and the defendant's blameworthiness.' " *Thompson*, 108 S.Ct. at 2708 (O'Connor, J., concurring in the judgment) (quoting *Enmund*, 458 U.S. at 825, 102 S.Ct. at 3391 (O'Connor, J., dissenting)). Specifically, we must consider whether a death sentence is proportionate to Sanders' culpability and whether his execution would serve any legitimate penological purpose.[21]

■■■ All murderers merit harsh punishment, but death may not be made a mandatory punishment. *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). *But see Walton v. Arizona*, —— U.S. ——, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511 (1990) (Scalia, J., concurring in part and concurring in the judgment). Rather, because culpability varies among defendants, the harshest punishment must be reserved for the most blameworthy. To a large extent, our system of capital sentencing relies upon the jury to evaluate the culpability of defendants. However, appellate courts also have a role to play in insuring that offenders whose blameworthiness is significantly mitigated are not arbitrarily grouped together with the most calculated or brutal of killers. For example, the Supreme Court has held that it is inherently disproportionate to execute those under 16, *Thompson*, 108 S.Ct. at 2698–2700, or those who are guilty only of vicarious felony murder. *Enmund*, 458 U.S. at 797–801, 102 S.Ct. at 3376–79. *But see Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (authorizing execution for vicarious felony murder if defendants evinced a "reckless disregard for human life"). In effect, this form of constitutional analysis requires us to ask whether the jury has abused its discretion by recommending death for a defendant for whom such a sentence is inherently inappropriate.

In addition, the Supreme Court has identified two societal goals that capital punishment may serve: deterrence and retribution.[22] *Gregg*, 428 U.S. at 182–83, 96 S.Ct. at 2929–30. If executing a given defendant would serve neither of these goals, it "is nothing more than the purposeless and needless imposition of pain and suffering." *Coker*, 433 U.S. at 592, 97 S.Ct. at 2866. The retributive value of capital punishment is closely tied to the defendant's culpability. Thus, while the death penalty may in some instances be an acceptable "expression of society's moral outrage at particularly offensive conduct," *Gregg*, 428 U.S. at 183, 96 S.Ct. at 2929–30, it cannot be imposed without regard to the defendant's "personal responsibility and moral guilt." *Enmund*, 458 U.S. at 801, 102 S.Ct. at 3378. No punishment can undo what has been done; at best, punishment requires the offender to pay a price that is in some way comparable to his culpability. But *if the severity of punishment is markedly*

---

**21.** This form of "proportionality analysis" must be distinguished from proportionality analysis under 11 *Del.C.* § 4209(g)(2)a. That provision requires this Court to determine whether a given death sentence is "disproportionate to the penalty recommended or imposed in similar cases." The United States Supreme Court has held that this form of analysis is not constitutionally mandated. *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). We must undertake this form of analysis only if a defen-

dant's sentence meets other challenges raised to its legality.

**22.** To be more precise, the Court has found that a legislature may validly conclude that the death penalty serves these two goals. The Court has also noted a third goal—the permanent incapacitation of dangerous criminals—but has never recognized its legitimacy. *See Gregg,* 428 U.S. at 183 n. 28, 96 S.Ct. at 2930 n. 28.

greater than the defendant's actual moral responsibility, its retributive value is considerably weakened. At some point, the death penalty ceases to be an articulate expression of society's outrage and becomes instead "the barbarity of exacting mindless vengeance." *Ford*, 477 U.S. at 410, 106 S.Ct. at 2602. At the same time, by imposing the death penalty society hopes that it can prevent future crimes by deterring criminal behavior. However, if it is improbable that the execution of a given defendant will have any effect on other potential criminals, then we must conclude that it is constitutionally impermissible.

A plurality of the Supreme Court appears to be ready to abandon this form of proportionality analysis, arguing that it vests appellate courts with untrammelled discretion to decide what is "cruel and unusual." *Stanford*, 109 S.Ct. at 2979–80 (plurality opinion). However, since a majority of the Court has not repudiated the proportionality principle, it remains a valid standard for judging the constitutionality of Sanders' sentence. For our own part, we would question the wisdom of abandoning this standard. The conviction that punishment should not be disproportionate to the blameworthiness of the offender and that it should serve some purpose is not the product of recent judicial innovation. *See, e.g., Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910). It is a fundamental precept underlying any fair system of justice, virtually implicit in the concept of ordered liberty. *See Solem v. Helm*, 463 U.S. 277, 284–88, 103 S.Ct. 3001, 3006–08, 77 L.Ed.2d 637 (1983). In determining whether a given exercise of the penal function is disproportionate, a court does not arrogate a legislative power to itself; rather, it seeks to determine the "difference between unrestrained power and that which is exercised under the spirit of constitutional limitations formed to establish justice." *Weems*, 217 U.S. at 381, 30 S.Ct. at 554–55. The courts have never been unwilling to establish the contours of procedural due process, *e.g., Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), or to determine the limits of free speech, *e.g., Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 768–69, 86 L.Ed. 1031 (1942), even though the bare texts of the Fourteenth and First Amendments do not define "due process" or "freedom of speech." We see no reason why the judiciary is not equally well-equipped to determine the meaning of the Eighth Amendment. Without doubt, death is the harshest punishment that a State may constitutionally impose upon an individual. Before a death sentence is carried out, it seems only fair that reviewing courts should pause to consider whether the sentence is arbitrary or whether it stems from the overreaching of the political forces that the Constitution is intended to limit. *See Whitley v. Albers*, 475 U.S. 312, 318, 106 S.Ct. 1078, 1083, 89 L.Ed.2d 251 (1986). Indeed, the Delaware death penalty statute, 11 *Del.C.* § 4209(g), requires an automatic review by this Court of every death penalty, even in the absence of an appeal by the defendant. In judging these matters, courts need not fall back upon subjective preferences, but may be guided by precedent and by the tools of legal reasoning that they rely upon to answer any difficult and unsettled question.

Unfortunately, the inability of the Supreme Court to agree upon the constitutional significance of the proportionality test makes the task of discerning meaningful precedents extremely difficult. With four justices prepared to repudiate the proportionality test, it is difficult for us to know how much weight to assign to cases such as *Thompson, Enmund*, or even *Penry*, whose analysis depends, at least in part, upon proportionality. Tallying justices does not strike us as a particularly cogent form of constitutional analysis. As a coordinate court of the federal system, we have the power to analyze unsettled federal questions, subject to Supreme Court review. *Stone v. Powell*, 428 U.S. 465, 493 n. 35, 96 S.Ct. 3037, 3052 n. 35, 49 L.Ed.2d 1067 (1976); *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 342, 4 L.Ed. 97 (1816). In doing so, we think that we are entitled, and indeed obligated, to take existing precedents at face value and interpret them to guide our decision.

The minimal deterrent value of executing Sanders. seems clear. If an individual's ability to refrain from committing a crime is severely weakened, then the threat of punishment, however severe, is unlikely to deter him. As the Court recognized in *Enmund,* "it seems likely that 'capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation.'" 458 U.S. at 799, 102 S.Ct. at 3377–78 (quoting *Fisher v. United States,* 328 U.S. 463, 484, 66 S.Ct. 1318, 1328–29, 90 L.Ed. 1382 (1946) (Frankfurter, J., dissenting)). In the case of a defendant such as Sanders, however, the act is largely the result of illness, not a calculation of cost and benefit. In view of his highly disturbed mental state, the likelihood that he "attache[d] any weight to the possibility of execution is so remote as to be virtually nonexistent." *Thompson,* 108 S.Ct. at 2700 (positing that the teenage offender is unlikely to be influenced by fear of execution). Moreover, since the number of homicides involving individuals suffering from significant volitional impairments is quite low, exempting them from execution would not diminish the general deterrent value of capital punishment. *See id.; see also* Criminal Justice Mental Health Standards, commentary at 323–24 (insanity defense raised in less than one percent of felony cases nationwide).

When our review of Sanders' sentence is cast in these terms, there is justification, albeit limited, for the imposition of the death penalty. However, we hesitate to discern a federal constitutional rule. Although such a rule would not be tantamount to an Eighth Amendment insanity defense, it would force the States to afford some exculpatory weight to evidence of mental illness. As we have already noted, however, the United States Supreme Court has assiduously avoided entering the debate over the appropriate role of such evidence, deferring instead to the judgment of the States.

Our analysis of the proportionality of Sanders' sentence is grounded in the belief that although psychiatric science cannot precisely determine the causes of an individual's behavior, it can determine when mental illness played a role in impelling a given defendant toward committing a criminal act. That belief is grounded first and foremost in the language of 11 *Del.C.* § 401(b), which accords legal significance to evidence of "a psychiatric disorder which substantially disturbed [a defendant's] ... behavior and/or that ... left such person with insufficient willpower to choose whether he would do the [criminal] act or refrain from doing it." It is also grounded in the uncontroverted psychiatric testimony that was presented at trial. Thus, although the General Assembly has abandoned efforts to identify and acquit defendants who suffer from an absolute volitional impairment, it continues to recognize the potential role of mental illness in undermining a defendant's ability to refrain from committing a criminal act. By contrast, some States have never been willing to give any weight to evidence of volitional impairment. *See, e.g., State v. Sikora,* 44 N.J. 453, 210 A.2d 193, 202 (1965). In such States, a defendant such as Sanders has historically been treated with no more consideration than a defendant who suffered from no mental disability at all. In Delaware, by contrast, such a defendant has historically been acquitted and is now identified as a candidate for treatment as well as punishment.

In the interest of federalism, the Supreme Court has traditionally recognized the right of the States to craft their own definitions of mental responsibility. To rule that, as a matter of federal constitutional law, the States may not execute a defendant suffering from a volitional impairment is to suggest that all States must accord some legal weight to evidence of such impairment, notwithstanding the fact that many States have consistently refused to do so. On the one hand, if a State recognizes evidence of volitional impairment, the retributive and deterrent value of executing a defendant who suffered from such an impairment appears low. On the other hand, no State need recognize such evidence. Thus, the logical requirements of Eighth Amendment jurisprudence and the requirements of federalism come into

conflict. The applicable federal law is too unsettled and we cannot speculate on how various Supreme Court justices might view the issue. To date, the Supreme Court has not attempted to limit the States in their restrictions on mental illness as a defense, or as mitigation, in a criminal case. To the extent that a trend is discernable it would appear that the Court continues to indulge the States "in the process of adjustment" in the area of criminal responsibility for mental illness. *Powell*, 392 U.S. at 536, 88 S.Ct. at 2156. Because we view the imposition of the death penalty following a guilty but mentally ill verdict by a properly instructed jury to be within the authority of the State, we find no federal constitutional bar to that result.

### D.

■ In view of the unsettled state of applicable federal law we requested the parties to submit supplemental memoranda addressing the effect of the Delaware Constitution upon Sanders' sentence. Having reviewed the submissions of the parties, we are now of the view that Article I, Section 11 of the Constitution of 1897 also does not preclude execution of a defendant following a guilty but mentally ill verdict.

Together with the Eighth Amendment, Article I, Section 11 traces its heritage to the English Bill of Rights of 1689. Moreover, the language of Article I, Section 11 is essentially identical to that of the Eighth Amendment:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted.... [23]

We believe that the core concern of Article I, Section 11 and the Eighth Amendment is the same: "[to] express[ ] the revulsion of civilized man against barbarous acts—the 'cry of horror' against man's inhumanity to his fellow man." *Robinson v. California*, 370 U.S. 660, 676, 82 S.Ct. 1417, 1425, 8 L.Ed.2d 758 (1962) (Douglas, J., concurring). As a result, our interpretation of Article I, Section 11 has been, and should be, guided by the same general principles

that have guided the Supreme Court's interpretation of the Eighth Amendment. *See, e.g., DeShields v. State*, Del.Supr., 534 A.2d 630, 638–40 (1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 217 (1988); *State v. Sheppard*, Del.Supr., 331 A.2d 142 (1974); *State v. Dickerson*, Del. Supr., 298 A.2d 761 (1973). Moreover, because popularly-elected legislatures have broad initial authority to determine the appropriate penalties for crimes, *Solem v. Helm*, 463 U.S. 277, 290, 103 S.Ct. 3001, 3009–10 (1983); *State v. Ayers*, Del.Supr., 260 A.2d 162, 169 (1969), our analysis of Article I, Section 11 has always accorded substantial deference to the judgment of the General Assembly. *See, e.g., Ayers*, 260 A.2d at 169; *State v. Cannon*, Del. Supr., 190 A.2d 514 (1963).

■ In its supplemental memorandum, the State appears to argue that our interpretation of Article I, Section 11 *must* defer both to the will of the General Assembly and to the United States Supreme Court's interpretation of the Eighth Amendment. In this case, however, we cannot defer to both. Under Eighth Amendment jurisprudence, appellate courts must review the proportionality of a death sentence to determine if there is an appropriate nexus between the punishment and the defendant's culpability. If, as the State argues, the rights secured by Article I, Section 11 are identical to those secured by the Eighth Amendment, then the proportionality principle is equally a part of Delaware's constitutional jurisprudence. However, since the United States Supreme Court has never applied the proportionality test to a case such as the one before us, we cannot defer to its judgment in deciding whether Sanders' sentence is proportionate to his fault under Article I, Section 11. Rather, if we are to adhere to Eighth Amendment principles in interpreting Article I, Section 11, we must bring our own judgment to bear upon the proportionality of Sanders' sentence. *Cf. Thompson*, 108 S.Ct. at 2698; *Enmund*, 458 U.S. at 797, 102 S.Ct. at 3376–77. On the other hand, if

---

**23.** The absence of the words "and unusual" in Delaware's formulation has been held to be of little or no significance. *State v. Cannon*, Del. Supr., 190 A.2d 514, 515 (1963).

we automatically conclude that Sanders' sentence is proportionate to his fault merely because the General Assembly has ordained that death is an acceptable punishment for a defendant such as Sanders, the proportionality test becomes meaningless.

It is equally untenable to argue that our Constitution must mean exactly the same thing as the United States Constitution. *See Cruzan v. Director, Mo. Dep't of Health,* —— U.S. ——, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224 (1990) ("State courts have available to them for decision a number of sources—*state constitutions,* statutes, and common law—which are not available to us.") (emphasis added); *California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 1630, 100 L.Ed.2d 30 (1988) ("Individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution."); *Moran v. Burbine,* 475 U.S. 412, 428, 106 S.Ct. 1135, 1144–45, 89 L.Ed.2d 410 (1986) ("Nothing we say today disables the States from adopting different requirements for the conduct of its [sic] employees and officials as a matter of state law."); *California v. Ramos,* 463 U.S. 992, 1013–14, 103 S.Ct. 3446, 3459–60, 77 L.Ed.2d 1171 (1983) ("It is elementary that States are free to provide greater protections in their criminal justice system than the Federal Constitution requires."); *Mills v. Rogers,* 457 U.S. 291, 300, 102 S.Ct. 2442, 2448–49, 73 L.Ed.2d 16 (1982) ("[A] State may confer *procedural* protections of liberty interests that extend beyond those minimally required by the Constitution of the United States. If a State does so, the minimal requirements of the Federal Constitution would not be controlling. . . .") (emphasis in original). *See also Bryan v. State,* Del.

Supr., 571 A.2d 170 (1990); *Van Arsdall v. State,* Del.Supr., 524 A.2d 3, 7 n. 5 (1987); *Goddard v. State,* Del.Supr., 382 A.2d 238, 240 n. 4 (1977). The Federal Constitution establishes a quantum of rights that all States must respect, a uniform set of protections that belong to all citizens. But because it is a *Federal* Constitution, its interpretation must take account of diversity among the States and devise constitutional limits that are appropriate for all places and situations. The Constitution is firmly rooted in national history and the original intent of its framers, and although its interpretation evolves over time, it does so slowly, giving rise to *national* rules only when they have a clear *national* foundation in evolving attitudes and needs. Accordingly, the United States Constitution establishes a minimum, the least protection that a State may provide to its citizens without betraying our heritage of democratic yet limited government. It does not establish a maximum; indeed, it could not without destroying the basic tenets of federalism.[24]

Although Delaware is bound together with the forty-nine other States in an indivisible federal union, it remains a sovereign State, governed by its own laws and shaped by its own unique heritage. An examination of those laws and that heritage may, from time to time, lead to the conclusion that Delaware's citizens enjoy more rights, more constitutional protections, than the Federal Constitution extends to them. If we were to hold that our Constitution is simply a mirror image of the Federal Constitution, we would be relinquishing an important incident of this State's sovereignty. In a very real sense, Delaware would become less of a State than its sister States

---

**24.** The State's argument that state constitutional interpretation should slavishly follow federal law has some curious implications. Since the Bill of Rights was not made binding upon the States until the adoption of the Fourteenth Amendment in 1868, it must be conceded that state constitutional protections had significance prior to that point. *Barron v. Baltimore,* 32 U.S. (7 Pet.) 243, 250, 8 L.Ed. 672 (1833) (Marshall C.J.) (holding that the federal Bill of Rights did not bind the States). Thus, the State is asking us to conclude that the Fourteenth Amendment should be treated as if it abolished the independent force of state provisions that are similar to incorporated federal provisions. Of course, the Fourteenth Amendment had no such effect, and we can discern no basis in Delaware law for treating it as if it had. Indeed, the text of many of Delaware's constitutional provisions, including Article I, Section 11, predate the United States Constitution itself. *See* Del. Const. of 1776, Declaration of Rights and Fundamental Rules of the Delaware State, § 16.

who recognize the independent significance of their Constitutions. *See, e.g., State v. Gerald,* 113 N.J. 40, 549 A.2d 792, 810–11 (1988); *Commonwealth v. Blystone,* 519 Pa. 450, 549 A.2d 81, 87 (1988), *aff'd,* —— U.S. ——, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990); *O'Neill v. Oakgrove Construction, Inc.,* 71 N.Y.2d 521, 528 N.Y.S.2d 1, 523 N.E.2d 277 (1988); *Colonial Pipeline Co. v. Brown,* 258 Ga. 115, 365 S.E.2d 827 (1988); *Commonwealth v. Madera,* 402 Mass. 156, 521 N.E.2d 738 (1988); *State v. Carter,* 322 N.C. 709, 370 S.E.2d 553 (1988); *State v. Stoddard,* 206 Conn. 157, 537 A.2d 446 (1988); *State v. Jewett,* 146 Vt. 221, 500 A.2d 233 (1985). Subject to the limits of the Supremacy Clause, no one would argue that our General Assembly should not legislate on subjects such as environmental protection merely because Congress has done so. Similarly, this State's judicial branch should not be foreclosed from interpreting our Constitution merely because the United States Supreme Court has interpreted similar provisions of the Federal Constitution.

Of course, we must make any constitutional ruling with care and circumspection. It is our "province and duty ... to say what the law is," but not to say what we think it should be. Thus, we may not draw upon our personal predilections of what constitutes "cruel punishment" in construing Article I, Section 11. We may, however, look to many other sources, including our State's popularly enacted legislation and other objective evidence of our State's standards of decency. We may look also to the reasoning of cases decided in other courts, including the United States Supreme Court, and determine if they provide persuasive answers to the questions before us. Finally, we may trace the evolution of our laws over time and discern constitutional significance in the patterns that emerge. We may analyze these sources by employing traditional tools of legal reasoning. Unlike the United States Supreme Court, however, we should not be influenced by concerns of federalism. The laws and his-

tory of our sister States have no bearing upon the scope of our own constitutional protections.

■ In applying the Delaware Constitution to this case, we must first determine whether Article I, Section 11, like the Eighth Amendment, forbids an execution when it would be disproportionate to the defendant's culpability. Perhaps recognizing that this Court cannot both apply the proportionality principle and automatically defer to the will of the General Assembly, the State argues that Article I, Section 11 differs from the United States Constitution *only* in that it does not protect defendants from a disproportionate sentence. To support this argument, the State relies upon *State v. Ayers,* Del.Supr., 260 A.2d 162 (1969), pointing out that when this Court analyzed the proportionality of a jail sentence in that case, it did so under the Eighth Amendment only. The State also quotes language from our recent decision in *DeShields:* "Article I, Section 11 of the Delaware Constitution relates only to the mode of punishment and not the length of a sentence authorized by the Legislature." 534 A.2d at 647 n. 25. Thus, it would appear that unlike the Eighth Amendment, Article I, Section 11 does not bar the imposition of a *jail* sentence that is arguably disproportionate.[25] *Cf. Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). However, a death sentence is in no way comparable to a jail sentence. "[E]xecution is the most irremediable and unfathomable of penalties; ... death is different." *Ford v. Wainwright,* 477 U.S. at 411, 106 S.Ct. at 2602–03. This simple statement—"death is different"—is perhaps less a rule of law than an inescapable conclusion. Accordingly, death is no less "different" in Delaware than anywhere else. Because of this important qualitative difference, it would indeed be "cruel punishment" within the meaning of Article I, Section 11 to end an individual's life without pausing to examine the logical basis for his sentence, without asking whether his

---

**25.** Since the Delaware Constitution is an organic body of law, there is no reason why it cannot be interpreted to provide *fewer* protections than the Federal Constitution. Of course, insofar as the Federal Constitution is more expansive, it must override contrary state law.

execution would serve any purpose. Thus, we find that Article I, Section 11, like the Eighth Amendment, demands that a death sentence be proportionate to a defendant's culpability and that it accomplish some legitimate penological end. Because we question the wisdom of any attempt to eliminate these established principles from federal law, we now affirm their independent force under our own Constitution.

Although, as we have noted in our discussion of federal proportionality standards, the execution of a mentally ill person is of limited deterrent or retributive value, particularly where the form of mental illness is that formerly recognized as a complete defense, nonetheless, we decline to hold that under no circumstances may the death penalty be imposed following a verdict of guilty but mentally ill. Proportionality, as a matter of State constitutional law, does not preclude a properly instructed jury from imposing the death penalty in the face of a claim of irresistible impulse. Unlike the categorical findings that usually accompany a diagnosis of lack of cognitive ability under the right-from-wrong test, the irresistible impulse defense may prove difficult to diagnosis and has been criticized as lacking a psychiatric foundation. *Wade v. United States*, 9th Cir., 426 F.2d 64, 67 (1970); *United States v. Freeman*, 2d Cir., 357 F.2d 606, 620 (1966). More importantly, the irresistible impulse is difficult for the trier of fact to apply with any degree of certainty because it poses the question of whether the defendant, on a given occasion, was unable to exercise control or simply refused to do so. *State v. White*, 60 Wash.2d 551, 374 P.2d 942 (1962) *cert. denied*, 375 U.S. 883, 84 S.Ct. 154, 11 L.Ed.2d 113 (1963). Where, as in Sanders' case, the defense of irresistible impulse is asserted in the face of a series of criminal acts, some of which require planning, a jury may well decline to credit the defendant's claimed inability to resist participating in a course of criminal conduct. Even if the jury were to conclude that the mental illness played a contributing role in the defendant's aberrant conduct it could further conclude that it did not relieve him of sufficient culpability to avoid the imposition of the death penalty.

Our conclusion that the imposition of the death penalty following a guilty but mentally ill verdict is not disproportionate under the Delaware constitution is prompted also by the recognition that the Delaware General Assembly in enacting 11 *Del.C.* §§ 401 and 408 sought to change not only the substantive provisions of the defense of insanity but the punishment mode as well. The power of the General Assembly to determine the limits of punishment for crime is well settled. *State v. Cannon*, Del.Supr., 190 A.2d 514 (1963). Unless constitutional impairment is clear, judicial restraint requires that the definition of the criminal law and its punishment be left to the legislature "in its wisdom to give expression to the public will." *Id.* at 518.

The original basis for the insanity defense under Delaware law is decisional not statutory. The earliest recorded reference to an "irresistible impulse" test may be found in *State v. Windsor*, Del. Oyer & Terminer, 5 Del. (5 Harr.) 512 (1851), a capital murder case. In charging the jury, the trial judge outlined the definition of insanity then prevailing in the State: "[T]he question is ... whether [the defendant] had at the time the *ability* to distinguish between right and wrong in reference to the act itself, and the *power* to choose whether he would do it or not." *Id.* at 539 (emphasis in original). The judge also explained then-contemporary views of capital punishment:

> The basis of accountability to God or man for any conduct is the power to distinguish between right and wrong, and to act accordingly. The sanction of all law rests on this assumption; the object of punishment can be served only on the same assumption. The law prescribes that he who commits murder shall suffer death; not in vengeance for the deed, but as a just public example to restrain others; but no one can commit murder who has not criminal capacity, and no just public example can be made by the execution of an irresponsible being.

*Id.* at 538–39. Ultimately, the jury rejected Windsor's insanity defense and he was sentenced to death. However, the case's reporter noted that "in consequence of great doubt of his sanity existing in the public mind, and especially with the medical profession, he has been respited from time to time by the Governor, and is yet (1856) in prison." *Id.* at 542.

Similarly, in *State v. Danby,* Del. Oyer & Terminer, 1 Houst. Cr.Cas. 166 (1864), the court charged the jury to excuse "an act [that] cannot be said to be a voluntary act, or the act of a free agent, but the mere act of the body without the consent or concurrence of a controling [sic] mind,—being the result rather of an irresistible and uncontrollable impulse." *Id.* at 172. In *State v. Reidell,* Del. Oyer & Terminer, 14 A. 550, 552 (1888), the court spoke of "diseases ... of that character which undermines and overthrows the will ...," and charged the jury that "[n]o enlightened criminal system of law punishes them for acts which, if the will was in a healthy state, would never be done, any more than it does the mere idiot, or person who never had any reason at all." *Id.* *See also Longoria v. State,* Del. Supr., 168 A.2d 695, 699–700 (1961), *cert. denied,* 368 U.S. 10, 82 S.Ct. 18, 7 L.Ed.2d 18 (1961); *State v. Jack,* Del.Gen. Sessions, 58 A. 833, 834–35 (1903); *State v. Cole,* Del. Oyer & Terminer, 45 A. 391, 393 (1899).

Prior to 1972, the General Assembly had not attempted to define the defense of insanity although it had accorded statutory recognition to the concept, apparently leaving its definition to the courts. In 1857, six years after the instruction in *Windsor,* the first statute establishing the defense of insanity was enacted. In pertinent part it provided:

> If upon the trial of any person upon an indictment charging a crime punishable with death, or an assault with an intent to commit a rape, or murder, the defense of insanity shall be made and established to the satisfaction of the jury empaneled on said trial, and the fact charged shall be proved, it shall be the duty of the jury

to return a verdict of 'not guilty by reason of insanity,' . . . .

11 *Del.Laws* Ch. 397.

Except for minor modifications in 1883 to identify the courts in which the insanity defense applied, 17 *Del.Laws* Ch. 75, and in 1915 to provide for the commitment to the Delaware State Hospital, of insanity acquittees, *Del.Code* 1915 § 2606, the identical statement of the insanity defense, without definition, appeared in successive codifications of Delaware law. *Del.Code* 1935 § 3082; 11 *Del.C.* § 4701 (1953). Thus, the General Assembly, while sanctioning the availability of the insanity defense, had not formulated its components nor specified any test to enable the trier of fact to determine whether a defendant was mentally ill. Up to that point, the insanity defense in Delaware, consisting of the right-from-wrong test combined with irresistible impulse, the cognitive and volitional prongs, owed its formulation to longstanding decisional law.

In 1972, the General Assembly, after long debate and discussion in previous sessions, enacted the Delaware Criminal Code, which became effective July 1, 1973. Introduction, *Delaware Criminal Code with Commentary* (1973). In addition to being a complete codification of all criminal offenses, the Criminal Code categorized the defenses to criminal liability. *Commentary,* § 101. In section 401 of the Code, the General Assembly for the first time formulated the insanity defense by adopting the cognitive-volitional standard which had its basis in prior Delaware decisional law. *Delaware Criminal Code with Commentary* § 401, *Commentary* at 69. With the enactment of the Criminal Code, the defense of insanity, theretofore a part of the common law of Delaware, became a matter of statutory right and definition.

Since the enactment of the Criminal Code in 1972, the General Assembly has engaged in periodic revisions of its substantive and procedural provisions including the modification and/or elimination of defenses. For example, the defense of voluntary intoxication was modified on four occasions between 1973 and 1976 to limit the common

law as well as the original Criminal Code availability of that defense. *Wyant v. State,* Del.Supr., 519 A.2d 649 (1986). The legislative revision was deemed "not [to] implicate any recognized constitutional right." *Id.* at 660. The General Assembly's revisionary power has also extended to the expansion of defenses beyond their scope at common law or as reflected in the original Code provisions. In 1982 it broadened the defense of justification to permit the use of force by an owner or occupier of a dwelling against an unlawful intruder. 63 *Del.Laws* Ch. 276.

As we have already discussed, the General Assembly's decision in 1982 to eliminate the volitional test from Delaware's definition of insanity reflected the difficulty of determining whether a defendant's actions were the product of an "irresistible impulse" or merely of a pathological impulse that was not resisted. This Court has already determined that reclassification of the mental illness defense under Delaware's "guilty but mentally ill" verdict is a reasonable response to dissatisfaction with the use of mental illness as a defense to criminal prosecutions. *Daniels v. State,* 538 A.2d at 1108–09. Although the repeal of the volitional test was a sharp departure from the historical traditions of this State, we do not view our historical practices as evidence of some constitutionally correct definition of insanity. We agree with the United States Supreme Court that it would be inappropriate to "freeze the ... dialogue between law and psychiatry into a rigid constitutional mold." *Powell v. Texas,* 392 U.S. 514, 537, 88 S.Ct. 2145, 2156–57, 20 L.Ed.2d 1254 (1968). Quite simply, we know far too little about the human mind to be able to declare certain classes of defendants categorically exempt from punishment. At least until science allows us to understand criminal pathology with much greater precision, the task of delineating the scope of the insanity defense must remain in legislative, rather than judicial, hands. Thus, our State's long history of recognizing the volitional test of insanity cannot now afford Sanders an absolute defense.

## VI

While we uphold Sanders' conviction and find no federal or state constitutional impairment in the use of a verdict of guilty but mentally ill as the basis for the imposition of the death penalty, we find plain error in the jury instructions which permitted its use in this case. Accordingly, we REVERSE the death sentence imposed by the Superior Court and REMAND the matter for a new penalty hearing.