Lawrence R. COLLINGWOOD, Jr.,
Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Jan. 23, 1991.
Decided: April 9, 1991.

Benjamin Shaw, III, Georgetown, and El-
lis S. Rubin (argued), Rubin, Rubin & Fu-
qua, P.A., Miami, Fla., for appellant.

Timothy J. Donovan, Jr. (argued), and
William L. George, Deputy Attys. Gen.,
Dept. of Justice, Wilmington, for appellee.

Before CHRISTIE, C.J., HORSEY and
WALSH, JJ.

WALSH, Justice:

This is an appeal by the defendant, Law-
rence R. Collingwood, Jr. ("Collingwood"),
from a conviction in the Superior Court of
First Degree Murder, First Degree Rob-
bery, Conspiracy and related weapons of-
fenses. Collingwood claims he was preju-
diced by the trial court's failure to empanel
a new jury following his last minute re-
quest to present an insanity defense. We
conclude that Collingwood has failed to
demonstrate that any specific prejudice
arose from the procedure used by the trial
judge. Therefore, we affirm his convic-
tions.

I

According to the testimony of witnesses,
on February 3, 1986, Steven Spence
("Spence") and Collingwood visited their
mutual friend Andrew Kerr ("Kerr"). The
three men sat in Kerr's bedroom smoking
marijuana and listening to music. After
about an hour, the three decided to commit
a robbery in order to obtain money to buy a
drug known as "crank" (methamphet-
amines). Collingwood, Kerr, and Spence,

riding in Spence's mother's car, toured the Camden, Delaware area, searching for a suitable target. The three men decided upon the Super Soda Center, a combination beverage and liquor outlet. It was agreed that Collingwood would rob the main store while Kerr and Spence robbed the separate liquor outlet.

After parking in a church lot across the street, the three men donned stockings and bandannas to cover their faces and approached the center. Kerr and Spence, the latter carrying an unloaded sawed-off shotgun, entered the liquor outlet. Collingwood, armed with a loaded .357 magnum revolver, entered the main store. Spence pointed the shotgun at Joseph Starrette ("Starrette"), who sat behind the counter, and Kerr demanded money. Starrette responded by producing a baseball bat, causing Kerr and Spence to run from the store. Collingwood, who was in the process of robbing the main store, saw Starrette chasing Spence and Kerr. Collingwood aimed his revolver through the window of the store and fired at Starrette. Before reaching the car, Spence heard a shot ring out. Shortly thereafter, Collingwood caught up with Spence and Kerr and told them that he had just "shot the guy." Starrette died from a gunshot wound an hour later.

Collingwood was arrested for first degree murder on September 4, 1987. He was initially represented by William N. Nicholas, Esquire ("Nicholas"). Suspecting possible mental instability, Nicholas arranged for Collingwood to undergo psychiatric evaluation. On March 22, 1988, approximately a month before the first scheduled trial date, Nicholas moved to extend the time for filing a notice of an insanity defense under Superior Court Criminal Rule 12.1.[1] In the motion, Nicholas indicated that Collingwood had undergone several psychiatric examinations, but that further testing was needed before it could be determined whether to raise an insanity defense.

For reasons unrelated to Collingwood's motion, trial was further rescheduled. On September 27, 1988, Nicholas moved to withdraw as counsel because he had accepted employment as a Deputy Attorney General. Howard Hillis, Esquire ("Hillis"), was appointed to represent Collingwood in his stead. Despite the earlier motion, suggesting the possibility of an insanity defense, no motion under Rule 12.1 was filed prior to trial.

Jury selection began on March 13, 1989, and the entire sixteen member panel was not chosen until March 15. The following day, Hillis notified the court at an office conference that Collingwood now wished to raise the defense of insanity.

According to Hillis, he had from the time of his appointment as counsel tried to convince his client that mental illness was his best defense; however, this defense was flatly rejected by Collingwood. Instead, Collingwood, apparently under the influence of his mother, wished to pursue an alibi defense, a defense that Hillis had repeatedly warned him had no chance of success and increased his chance of receiving the death penalty. After the jury had been selected, Collingwood apparently changed his mind and indicated to Hillis that he now realized that mental illness was his only defense.

Hillis also advised the court that there was a factual foundation for an insanity defense. In addition to a family history of mental illness and previous commitments as a juvenile to a mental hospital, Nicholas had arranged for Collingwood to be examined by a Harvard University psychiatrist, Dr. Anneliese Pontius, who had diagnosed him as suffering from temporal lobe epilepsy.

At defense counsel's request, the trial court delayed the swearing in of the jury until Tuesday of the following week. During the interim, counsel was able to secure Dr. Pontius' written report and arrange for Collingwood to be interviewed by a clinical psychologist.

On Wednesday, March 22, the trial judge ruled that Dr. Pontius' report provided a

---

**1.** Rule 12.1 requires a defendant to notify the Attorney General that he intends to raise an insanity defense at least thirty days prior to trial.

foundation for an insanity defense and permitted Collingwood to enter a plea to that effect. Regarding the jury that had been selected, the court had earlier indicated its intention to try to preserve the panel, even if Collingwood's change of defense required a delay in the start of trial. Neither the prosecutor nor defense counsel objected to this arrangement.[2]

The court then addressed the jury at length informing them that, through no one's fault or lack of diligence, a "matter of great substance" had arisen necessitating a delay in the start of trial in order to "allow the defense to explore certain areas which may give rise to a defense that ... the defense had not been permitted to raise prior to that." The court then went on to impress upon the jury the desirability of preserving the present panel and strongly cautioned the jurors to avoid contact with media publicity about the case and to avoid any discussion of the case with others.

As planned, the jury was reassembled twenty-six days later, on April 17. On that day, each of the sixteen jurors and alternates were questioned individually regarding his or her ability to render a fair and impartial verdict of "not guilty by reason of insanity" or "guilty, but mentally ill" in accordance with the law and the court's instructions. During the course of *voir dire*, six of the sixteen members of the panel (four jurors and two alternates) were excused from further service. Following additional *voir dire*, these six were replaced from a venire especially assembled for this purpose.[3] The jury, as supplemented, was sworn and the trial resumed the following day.

## II

Collingwood contends that the trial judge's actions in granting a continuance, combined with the use of the same jury panel, were inherently prejudicial. Collingwood also claims that *voir dire* questions concerning the insanity defense were not sufficiently probative of possible juror bias. To the contrary, the State argues that the trial judge properly attempted to preserve the jury panel while granting Collingwood's request to delay the start of trial, and that the individual *voir dire* of the jurors regarding the insanity defense was sufficient to disclose juror bias or prejudice.

■ The purpose of jury *voir dire* is to uncover any bias or prejudice of potential jurors in order to insure the participation of an impartial jury sworn to render a verdict on the evidence presented and in conformity with the instructions of the court. *DeShields v. State*, Del.Supr., 534 A.2d 630, 634 (1987). The trial judge has broad discretion in deciding whether prospective jurors should be excused for cause, and the court's exercise of discretion will be disturbed only on a showing of abuse of discretion and actual prejudice. *Id.* at 636; *Riley v. State*, Del.Supr., 496 A.2d 997, 1004 (1985). Where a defendant fails to object at trial to *voir dire* procedures, a court's discretion may only be challenged upon a showing of plain error. *Weber v. State*, Del.Supr., 547 A.2d 948, 953 (1988).

■ Although Collingwood did not object at trial, through different counsel he now claims that the *voir dire* process was so defective as to infringe on his right to a fair trial. Collingwood argues that it was inherently prejudicial to recall the same jury panel after a four week delay since the jury "could not help but divine the reason for delay" and thus "must have readily assumed that [he] had altered his

---

**2.** When he first informed the court of Collingwood's change of heart, Hillis indicated a concern that trying to preserve the panel, while continuing the start of trial, might "contaminate" the jury; however, he gave no indication what form such contamination might take and expressed no further concerns in this regard during the course of the ensuing week. The prosecutor, on Monday, March 20, also expressed a concern that attempting to preserve the panel might expose the jurors to pre-trial publicity about the case. However, neither attorney objected or expressed any dissatisfaction or concern when the trial judge ruled that he would not dismiss the existing jury panel.

**3.** Both defense counsel and counsel for the State were given additional peremptory challenges to exercise during the April 17 *voir dire*.

defense" to insanity, because his "not guilty" plea was baseless. We find no merit in this contention.

In delaying the start of trial, the trial judge acted commendably and with the consent of counsel in order to afford Collingwood an opportunity to present a new defense. The court conducted a supplemental *voir dire* designed to expose any possible prejudice, invited counsel to assist in the *voir dire* process and allowed counsel the benefit of additional peremptory challenges. Moreover, Collingwood has identified no specific prejudice which arose by reason of the continuance. His mere surmise that the jury must have drawn an adverse inference from his late assertion of the insanity defense does not suffice. A simple plea of "not guilty" is not so inherently inconsistent with an insanity defense as to create an air of jury suspicion by its late assertion. Indeed, the underlying rationale for the insanity defense is that the defendant's inability to appreciate the wrongfulness of his actions precludes a finding of guilt. *Sanders v. State*, Del. Supr., 585 A.2d 117, 136 (1990).

Finally, the trial court was careful not to attribute the delay to Collingwood. The trial judge specifically instructed the jury that a "matter of great substance" had arisen suddenly through no fault of the defendant and explained that as a result of such new matter, the defendant may present a defense which had not been permitted prior to that point. Not only do such instructions eliminate any possible prejudice attributable to delay, they add credence to Collingwood's position by attributing the new plea to factors beyond the defendant's control. Thus, we find the trial judge's manner and method of handling the belated assertion of the insanity defense to be acceptable and to have caused no prejudice to Collingwood.

## III

■ Collingwood's second contention alleges error in the trial court's failure to question prospective jurors extensively to discern any confusion between the verdicts of "not guilty by reason of insanity" and "guilty, but mentally ill." Collingwood claims that because the questions may have confused the jurors as to the distinction between verdicts,[4] the jurors were led to believe that he was "straddling both sides of the fence by pleading alternatively." We disagree. After returning from the four week continuance, the jurors were subject to individual *voir dire* designed to uncover any bias or prejudice concerning mental illness issues. The *voir dire* questioning was as follows:

1. Are you aware that the law does not hold a person responsible for his act if that person was suffering from a mental illness or mental defect which substantially incapacitated him from appreciating the wrongfulness of his conduct at the time he committed the act?

2. Do you agree with that law?

3. Can you follow the Court's instruction in the area of the law whether or not you agree with the law?

4. If you find Lawrence R. Collingwood, Jr., was suffering from such a mental illness or mental defect at the time Joseph Starrette died, could you find Lawrence R. Collingwood, Jr., not guilty by reason of insanity?

---

4. The distinction between the verdicts of "not guilty by reason of insanity" and "guilty, but mentally ill" lies in the degree of mental impairment. "Not guilty by reason of insanity" requires the mental impairment be so severe as to render the defendant unable to distinguish right from wrong. 11 *Del.C.* § 401(a). Such a verdict carries with it an acquittal with confinement to a mental hospital until such time as the patient is considered able to reenter society. Conversely, where the mental illness did not affect the defendant's ability to appreciate the wrongfulness of his actions, rather only his volitional impulse to refrain from performing such actions, a verdict of "guilty, but mentally ill" will be reached. 11 *Del.C.* § 401(b). Under 11 *Del.C.* § 408(b), such a verdict carries with it the possible imposition of the same sentence allowable following a standard guilty verdict. However, the defendant would commence his sentence in a mental hospital and be discharged to continue his sentence in prison when it was determined a discharge would be in the best interests of the defendant. *See generally Sanders*, 585 A.2d at 123–25 (tracing the history of the insanity defense and the evolution and distinction between legal insanity and volitional impairment).

5. Under certain circumstances, the law permits a verdict of "guilty, but mentally ill." Could you follow the Court's instructions and return such a verdict if the facts in the case warranted it, whether you agree with the law or not?

During *voir dire*, one juror responded negatively to question five, concerning her ability to return a verdict of "guilty, but mentally ill." Following an explanation by the court of the distinction between the two verdicts, she changed her answer to "yes." Collingwood argues that because one juror needed further explanation, the court should have realized a deficiency in the *voir dire* questioning. However, the confusion of one juror as to the distinction between verdicts does not raise a presumption of confusion with respect to the entire panel.[5] The purpose of *voir dire* is to uncover biases and prejudices and to discern the willingness of the jurors to follow the court's instructions. *Riley*, 496 A.2d at 1004. In the absence of any manifestation of mental impairment, the court is not required to probe to determine if the jury understands the differences between verdicts. Such a function is served by the full instruction on the law given the jury prior to deliberations. Thus, we find no evidence of confusion among the jury which would prejudice Collingwood's right to a fair trial. The additional *voir dire* questioning of the individual jurors was sufficient to uncover any bias or prejudice.

The judgment of the Superior Court is AFFIRMED.

---

5. The juror to whom further explanation was given was an alternate and did not participate in the rendering of the verdict.